# Everett Lee Mueller

## v.

# Commonwealth of Virginia

Record Nos. 920287 and 920449

September 18, 1992

Present: All the Justices

*Cary B. Bowen; Christopher J. Collins (Bowen and Bowen,* on brief), for appellant.

*Robert H. Anderson, III, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

JUSTICE KEENAN delivered the opinion of the Court.

Charity Powers, age ten, disappeared in the early morning hours of October 6, 1990. Four months later, her body was recovered from a shallow grave near the home of Everett Lee Mueller. Mueller was arrested and thereafter confessed to her rape and murder.

At the first stage of a bifurcated trial, conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury found Mueller guilty of capital murder in violation of Code § 18.2-31(5) and -31(8) (murder in the commission of a rape, and murder of a child under 12 in the commission of an abduction). The jury also convicted Mueller of rape

and abduction with intent to defile, and it fixed his punishment at life imprisonment on each of those charges. In the penalty phase of the capital murder trial, the jury fixed Mueller's punishment for capital murder at death, based on findings of both vileness and future dangerousness. After the hearing required by Code § 19.2-264.5, the trial court imposed the sentences fixed by the jury.

Mueller is before this Court for automatic review of his death sentence and, pursuant to Code § 17-110.1, we have consolidated that review with his appeal of his capital murder conviction. We have also certified from the Court of Appeals Mueller's appeal of his noncapital convictions. Code § 17-116.06. Further, in accordance with Code § 17-110.2, we have given this matter priority on our docket. We review the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party below. *Cheng* v. *Commonwealth*, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990).

## I.

## THE EVIDENCE

The evidence at trial showed that on the evening of October 5, 1990, Taryn Potts took her daughter, Charity Powers, to a skating rink and left her there for the evening. Potts had arranged to have a friend, Steve Harris, drive Charity home from the rink later that night. However, Harris fell asleep and he did not go to the rink. When Potts arrived home at 3:00 a.m. on October 6, 1990 and discovered that Harris had not brought Charity home, she immediately contacted the police, and they began to look for her daughter.

Kevin H. Speeks, who knew Charity, testified that he saw her at a fast food restaurant near the skating rink about 12:50 a.m. on October 6, 1990. While at the restaurant, Speeks also observed a man with an unkempt appearance, who appeared to be thirty years of age and of medium height, driving a cream-colored station wagon with wood siding through the parking lot several times. As Speeks left the restaurant, he saw that the man was standing on the right side of the building. Speeks also saw that Charity was sitting on a curb located on the same side of the building. Sergeant Mike Spraker of the Chesterfield County Police Department testified that Mueller customarily drove a cream-colored station wagon which had wood siding.

In conversations with the police on October 8 and 9, 1990, Mueller admitted speaking with a young, white female on the night of October 5, 1990, at a fast food restaurant that might have been near the skating rink. As a result of information gained in their investigation, the police searched for Charity's body near Mueller's home and on February 8, 1991, they found "a clump of hair and what looked like some white bone sticking out of the ground." Thereupon, the police exhumed Charity's body, which had been buried about 900 feet behind Mueller's house. An investigator also found a knife sticking in the ground about 174 feet from the grave.

The police arrested Mueller on February 12, 1991. After being advised of his *Miranda* rights, Mueller agreed to talk with Detective R. Wayne Garber of the Chesterfield County Police Department and John M. Palfi, an FBI special agent. Garber and Palfi interrogated Mueller for approximately four and one-half hours. During this interrogation, Mueller stated several times that he was ready to go to jail and that the police should put him in jail. Mueller did not state at any time that he wished to end the questioning. Approximately two hours into the interrogation, Agent Palfi left the room. Shortly thereafter, Mueller asked Detective Garber, "Do you think I need an attorney here?" Garber shook his head slightly from side to side while holding his arms out and his palms up in a shrug-like manner, stating, "You're just talking to us."

Several minutes later, Mueller confessed to the crime. Mueller stated that he had agreed to give Charity a ride home from the restaurant but that he drove her to his house instead. He admitted that he was thinking about having sex with her and he stated that he thought she was 18 or 19 years old. Charity was approximately 4'8'' tall and weighed 90 pounds. Mueller stated that Charity agreed to have sex with him, and she told him that she wanted to go home afterward. Mueller took Charity to the woods behind his house where he had intercourse with her. He stated that although he had a knife nearby, he did not use it.

Mueller stated that he strangled Charity to death because he was afraid that she would report the incident to the police. He also stated that he had been drinking heavily and that, the next morning, he did not know whether he had dreamed about the previous night's events or whether they actually had occurred. When he went to check the woods, he saw Charity's body. He then purchased a shovel from a local store, buried the body, and burned Charity's clothes and jewelry.

After making this confession, Mueller led the police to the site where he had buried the body. He also showed them where he had burned the clothing and jewelry, as well as the area where he had left the knife. This was the same area where the police earlier had found a knife. Additionally, Mueller showed the police the location where he had intercourse with Charity. This area was about 15 feet from where the knife was found.

Dr. Marcella Fierro, who conducted an autopsy on Charity's body, testified that Charity's throat had been cut to the depth of one inch, resulting in a horizontal cut on the epiglottis, which is located on the trachea. She further testified that such a cut would result in the severance of the carotid artery and the jugular vein. According to Dr. Fierro, a person suffering from such an injury would die after several minutes, and there were indications that Charity had bled before her death. Based on these facts, Dr. Fierro testified that the cause of death was an "acute neck injury."

Additionally, Dr. Fierro found that, upon examining the skin over the breast area, there were "irregular holes in the area where each nipple would be." Dr. Fierro testified that she believed this condition to be the result of an injury, but she could not determine its cause or whether it had occurred before or after death. Dr. Fierro's examination also revealed a "big gash" on the victim's upper left thigh. Dr. Fierro stated that this could be an injury but that she could not determine whether it had occurred before or after Charity's death. However, Dr. Fierro testified that if it were an injury, it would have resulted from application of a "blunt or sharp force." Dr. Fierro also determined that there were three tears to the hymenal ring of the vagina which were consistent with sexual penetration.

## II.

### ISSUES PREVIOUSLY RESOLVED

Mueller's appeal raises certain legal issues which are resolved by our prior decisions. We reaffirm our previous rejection of these contentions. Therefore, we will not discuss them beyond giving citations to representative cases in which those issues were decided adversely to Mueller's claims. The issues raised here which have been expressly rejected by this Court are:

A. The death penalty violates the United States Constitution's prohibition against cruel and unusual punishment. *See George*

v. *Commonwealth*, 242 Va. 264, 271, 411 S.E.2d 12, 16 (1991), *cert. denied*, 503 U.S. ___, 112 S.Ct. 1591 (1992); *Yeatts* v. *Commonwealth*, 242 Va. 121, 126, 410 S.E.2d 254, 258 (1991), *cert. denied*, ___ U.S. ___, 112 S.Ct. 1500 (1992).

B. The aggravating circumstance of "vileness" set forth in the capital murder statute is unconstitutionally vague. *See Spencer* v. *Commonwealth*, 238 Va. 563, 569, 385 S.E.2d 850, 853 (1989), *cert. denied*, 493 U.S. 1093 (1990)(Spencer III); *Gray* v. *Commonwealth*, 233 Va. 313, 320-21, 356 S.E.2d 157, 161, *cert. denied*, 484 U.S. 873 (1987).

C. The verdict form was defective because it did not list the mitigating factors mentioned in the statute. *See Buchanan* v. *Commonwealth*, 238 Va. 389, 416-17, 384 S.E.2d 757, 773 (1989), *cert. denied*, 493 U.S. 1063 (1990); *Watkins* v. *Commonwealth*, 229 Va. 469, 491, 331 S.E.2d 422, 438 (1985), *cert. denied*, 475 U.S. 1099 (1986); *LeVasseur* v. *Commonwealth*, 225 Va. 564, 595, 304 S.E.2d 644, 661 (1983), *cert. denied*, 464 U.S. 1063 (1984).

## III.

## ASSIGNMENTS OF ERROR WAIVED

Because Mueller did not address in his brief assignments of error 7, 8, 9, 12, and 16, he is deemed to have waived them.[1] Rule 5:27(e); *see Quesinberry* v. *Commonwealth*, 241 Va. 364, 370, 402 S.E.2d 218, 222, *cert. denied*, 502 U.S. ___, 112 S.Ct. 113 (1991).

---

[1] These assignments of error are:

7. The Court erred in denying Defendant's Motion to Strike as to abduction, rape and capital murder.

8. The Court erred in refusing to give Defendant's instruction regarding intent to rape a person under the age of 13.

9. The Court erred in refusing to set aside the verdicts as to abduction, rape and capital murder.

12. The Court erred in permitting the jury to see a videotape of the excavation of the victim's body.

16. The Court erred in refusing to set aside the verdict.

## IV.

## PRE-TRIAL MATTERS

A. Admissibility of Mueller's February 12, 1991 Confession.

Mueller contends that the trial court erred in refusing to suppress his confession of February 12, 1991. He does not contest the adequacy of the *Miranda* warnings given at the outset of the interrogation, nor does he challenge the validity of his initial waiver of these rights. Rather, Mueller asserts only that Detective Garber's response to his question, "Do you think I need an attorney here?", invalidated the earlier *Miranda* warnings given to him. Thus, he contends that his subsequent confession was involuntary.

In assessing the effect of Detective Garber's response on the voluntariness of Mueller's statement, we apply a well-established standard of review. In *Gray* v. *Commonwealth*, 233 Va. at 324, 356 S.E.2d at 163, we said:

> A defendant's waiver of his *Miranda* rights is valid only if the waiver is made knowingly, voluntarily and intelligently. *Miranda*, 384 U.S. at 475. Whether a statement is voluntary is ultimately a legal rather than factual question. *See Miller* v. *Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 450 (1985). Subsidiary factual questions, however, are entitled to a presumption of correctness. *Id.* at 112, 106 S.Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically impaired." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether a defendant's will has been overborne, courts look to "the totality of all the surrounding circumstances," *id.* at 226, including the defendant's background and experience and the conduct of the police, *Correll* v. *Commonwealth*, 232 Va. 454, 464, 352 S.E.2d 352, 357 (1987); *Stockton*, 227 Va. at 140, 314 S.E.2d at 381.

The record shows that Mueller was 42 years old at the time he made this confession and that he had a high school equivalency

diploma. Prior to the interrogation, Detective Garber advised Mueller of his rights under *Miranda* and Mueller stated that he understood each of those rights.

Earlier investigative efforts in this case also demonstrate Mueller's experience with police interrogation procedures. On October 9, 1990, Garber read a ''Miranda Right Form'' to Mueller. After Garber ascertained that Mueller understood the content of the form, Mueller signed a written waiver of his *Miranda* rights. On two occasions after signing this waiver, Mueller exercised his right to terminate police questioning.

In addition, the record shows that several years earlier, Mueller had been informed of and had waived his *Miranda* rights on three occasions. On each of these occasions, he executed a form waiving his *Miranda* rights, and he gave a statement to the police.

We also note that, during the February 12, 1991 interrogation, Mueller made some statements which further demonstrate that he was aware of the consequences of talking to the police. Before confessing, Mueller expressed concern regarding where he would be incarcerated, given the serious nature of the crimes. After confessing to the crimes, he told Detective Garber and Agent Palfi that he had wanted ''to get it off his chest.'' At this time, Mueller further stated, ''I got death coming to me. I knew it as soon as I opened my mouth.''

We also consider the factual findings made by the trial court concerning Mueller's confession. The trial court found that Mueller knew how to ask for the assistance of legal counsel, as evidenced by his request for such assistance on October 9, 1990, during the course of a prior interview with Detective Garber and Agent Palfi; that the police properly advised Mueller of his *Miranda* rights on February 12, 1992; and that he understood those rights prior to confessing to the crimes. The trial court further found that Mueller's question to Detective Garber on February 12, 1991 was not an expression of a desire for the assistance of counsel.

Mueller does not assert that these factual findings are unsupported by evidence taken at the suppression hearing. Based on our review of this evidence, we conclude that the factual findings of the trial court are supported by the record and, therefore, we accord them substantial weight in our determination whether Mueller's statement was voluntary. *See Miller* v. *Fenton*, 474 U.S. 104, 112 (1985).

Based on the above evidence and findings, we hold that Mueller's question, "Do you think I need an attorney here?", and Detective Garber's response, did not invalidate Mueller's earlier waiver of his *Miranda* rights. Initially, we find that Mueller's question to Garber did not constitute a request for counsel. In *Eaton* v. *Commonwealth*, 240 Va. 236, 253-54, 397 S.E.2d 385, 395-96 (1990), *cert. denied*, 502 U.S. ___, 112 S.Ct. 88 (1991), this Court stated that "custodial interrogation must cease, when the accused, having received *Miranda* warnings and having begun to respond to the questions of the authorities, 'has *clearly* asserted his right to counsel.'" (quoting *Edwards* v. *Arizona*, 451 U.S. 477, 485 (1981)) (emphasis in original). In *Eaton*, the police had continued to question the defendant after he had asked, "You did say I could have an attorney if I wanted one?" 240 Va. at 250, 397 S.E.2d at 393. This Court held that the defendant's question did not constitute an unambiguous request for counsel so as to invoke the *Edwards* rule. 240 Va. at 254, 397 S.E.2d at 396. Here, we likewise hold that Mueller's question to Detective Garber did not constitute an unambiguous request for counsel.

Mueller contends, however, that even if his question did not constitute a request for the assistance of counsel, Detective Garber's response nevertheless invalidated Mueller's earlier waiver of his *Miranda* rights. We disagree. Based on our review of the videotape of the interrogation, we observe that Garber did not, as contended here by Mueller, respond to Mueller's question by answering "No." Rather, he replied, while shrugging and shaking his head slightly from side to side, "You're just talking to us." Considering the totality of the circumstances detailed above, including Mueller's prior experience in the criminal justice system and his previous contacts with Detective Garber and Agent Palfi, we find that Garber's response to the question at issue did not invalidate Mueller's earlier waiver of his *Miranda* rights. Moreover, since Garber's response to Mueller did not constitute an unambiguously negative reply, the information provided in the initial advisement of *Miranda* rights was not altered by this response.

We also reject Mueller's assertion that his repeated statements that he wanted to be taken to jail constituted an invocation of his right to terminate police questioning. In *Akers* v. *Commonwealth*, 216 Va. 40, 216 S.E.2d 28 (1975), this Court confronted a similar situation where the defendant, after being advised of his *Miranda* rights, stated, "Do I have to talk about it now?" In response to this

question, the police merely continued the interrogation. This Court held that the defendant's question was not an invocation of his right to terminate questioning, stating, ''Defendant's inquiry was no more than an impatient gesture on his part. If defendant had desired to end the interrogation, he could have simply said, 'I do not want to answer any more questions.''' 216 Va. at 46, 216 S.E.2d at 32.

Based on our review of the videotape of Mueller's interrogation, we likewise conclude that his statements regarding going to jail were simply impatient gestures and that they did not constitute an invocation of his right to terminate the interrogation. After each such statement, Mueller continued to talk with Garber and Palfi, giving no indication that he wanted to end the discussion. Moreover, when Palfi asked him whether he would rather talk to other officers instead of himself and Garber, Mueller responded, ''I've been talking to you for four months. I've established a pretty good relationship with you guys.'' Finally, the record shows that, during two previous interviews with Garber, Mueller unambiguously had terminated the police interrogation by standing up and stating that he wanted the officers to stop questioning him.

For these reasons, on our independent review of the record, we conclude, as a matter of law, that Mueller's statement of February 12, 1991 was voluntary and admissible.

## B. Change of Venue.

Mueller filed a pretrial motion requesting a change of venue on the ground that extensive media coverage of the murder made it impossible for him to receive a fair trial in Chesterfield County. The articles and television reports he adduced included information that Mueller was charged with the murder of Charity Powers, that Mueller had a previous criminal record which included prior rape convictions, and that Mueller had confessed to raping and killing Charity. Mueller also presented to the trial court affidavits from residents of Chesterfield County stating that, based on what they had seen or heard in the media, they believed that Mueller probably was guilty of raping and killing Charity Powers. The trial court took the motion for change of venue under advisement. Mueller renewed this motion on the day of trial. After the jury was empaneled, the trial court denied the motion, stating that it was satisfied that the jury panel was impartial.

Mueller argues that the trial court erred in denying his motion for a change of venue because the media coverage was inflammatory and contained information regarding his confession and his prior criminal record. Mueller contends that these aspects of the media coverage necessitated a change of venue in order to protect his rights afforded under the Sixth, Eighth, and Fourteenth amendments of the United States Constitution. We disagree.

Initially, we observe that there is a presumption that a defendant can receive a fair trial from the citizens of the jurisdiction in which the offense occurred. It is the burden of the defendant to overcome this presumption by demonstrating that the feeling of prejudice on the part of the citizenry is widespread and is such that would ''be reasonably certain to prevent a fair trial.'' *Stockton* v. *Commonwealth*, 227 Va. 124, 137, 314 S.E.2d 371, 380, *cert. denied*, 469 U.S. 873 (1984)(citation omitted). Further, the decision whether to grant a change of venue lies within the sound discretion of the trial court. *George*, 242 Va. at 274, 411 S.E.2d at 18; *LeVasseur*, 225 Va. at 577, 304 S.E.2d at 651. Therefore, the trial court's ruling on this issue will not be disturbed on appeal unless the record affirmatively shows an abuse of discretion. *Id.*

Extensive media coverage which discloses information about the accused, including his criminal record, does not, of itself, mandate a change of venue. *Buchanan*, 238 Va. at 407, 384 S.E.2d at 767; *Mackall* v. *Commonwealth*, 236 Va. 240, 250, 372 S.E.2d 759, 766 (1988), *cert. denied*, 492 U.S. 925 (1989). A significant factor in determining whether a change of venue is warranted is whether the media reports are factual and accurate. *Buchanan*, 238 Va. at 407, 384 S.E.2d at 768. Here, Mueller does not challenge the factual nature or accuracy of the media coverage surrounding his case.[2] Moreover, we find no indication in the record that any of the media reports were inaccurate.

Another significant factor in determining whether the venue of a trial should be changed is the difficulty encountered in selecting a jury. *Id.* In the present case, 47 venirepersons were examined.

---

[2] Mueller argues, however, that an editorial published in the *Richmond Times - Dispatch*, five months before the hearing on his motion for change of venue, was inflammatory. While the editorial did refer to the murder of a child as being ''among the sharpest evidence of the utter corruptibility of man,'' it also stated that Mueller's guilt in the Powers case had yet to be established. Accordingly, we do not view this article as being prejudicial to Mueller's right to receive a fair trial.

Of this number, only nine had to be excused because of their predisposition toward belief in Mueller's guilt.

As the United States Supreme Court has stated:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin* v. *Dowd*, 366 U.S. 717, 723 (1961). Here, given the factual nature of the media coverage and Mueller's tacit acquiescence in the accuracy of its content, as well as the relative ease with which a jury was empaneled, we hold that the trial court did not abuse its discretion in denying Mueller's motion for a change of venue.

## V.

## JURY SELECTION

A. Refusal to Allow Questions on Voir Dire.

Mueller next argues that the trial court erred in refusing to allow certain questions on voir dire which he contends were necessary to determine whether any prospective jurors were predisposed toward imposing the death penalty. Mueller asserts that he should have been allowed to ask these questions because the Commonwealth was entitled to conduct the opposite line of questioning, *viz.*, whether certain prospective jurors were unalterably opposed to the death penalty. *See Wainwright* v. *Witt*, 469 U.S. 412, 424 (1985); *Adams* v. *Texas*, 448 U.S. 38, 45-46 (1980); *Witherspoon* v. *Illinois*, 391 U.S. 510, 522 (1968).

A total of 47 persons comprised the venire. From this group, 23 persons were struck for cause. Mueller objected to the trial court's qualification of ten of the remaining 24 members. However, he objected to only two members, Ruby Moschler and Max Zoeckler, on the grounds that they were "death prone."

An examination of Mueller's voir dire of Ruby Moschler reveals that the trial court did not reject any question regarding

Moschler's ability to impose a life sentence.[3] Since Mueller did not proffer any such question which was rejected by the trial court, he may not claim on appeal that his right to question this prospective juror was violated. *See Morgan* v. *Illinois*, ___ U.S. ___, ___, 112 S.Ct. 2222, 2229 (1992); *LeVasseur*, 225 Va. at 585, 304 S.E.2d. at 655.

During his voir dire of Max Zoeckler, Mueller sought to ask, "[I]f in sitting in the guilt phase of the trial you conclude beyond a reasonable doubt that Mr. Mueller has raped and killed a 10 year old child, don't you think that death is the only appropriate punishment for that?" The trial court sustained the prosecutor's objection to this question. Counsel for Mueller then attempted to ask Mr. Zoeckler,

> [I]f you sit in the guilt phase of the trial and you determine beyond a reasonable doubt that Mr. Mueller raped and abducted and killed a 10 year old girl, and then you sit in the sentencing phase and listen to the evidence in aggravation and the evidence in mitigation, aren't you going to think the only appropriate sentence is death?

The trial court also sustained the prosecutor's objection to this question.

We hold that the trial court did not err in refusing both of these questions since they were argumentative and provided the prospective juror with no basis upon which to express an opinion. *See Buchanan*, 238 Va. at 402, 384 S.E.2d at 765; *Patterson* v. *Commonwealth*, 222 Va. 653, 659 n.*, 283 S.E.2d 212, 216 n.* (1981). Further, even if we disregard the argumentative nature of these questions, we still find that the trial court's ruling did not violate Mueller's right to a fair and impartial jury.

This Court has held that where the voir dire questioning conducted by the trial court otherwise "assure[s] the removal of those

---

[3] In fact, Mueller was allowed to ask Moschler whether she would be "predisposed towards the death penalty" if she heard facts which showed Mueller to be guilty beyond a reasonable doubt. Moschler replied, "[I]f the evidence in a trial proved to me that he had done all these things, I will be in favor of [the death penalty]." Moschler clarified this answer by stating that she would make this decision only after weighing all the evidence in the penalty phase. She also stated that she could consider imposing a life sentence. Further, in response to a question posed by counsel for Mueller, she stated that there was evidence that could keep her from imposing the death penalty.

who would invariably impose capital punishment,'' it is not reversible error for the trial court to deny defense counsel additional questions on this subject. *Turner* v. *Commonwealth*, 221 Va. 513, 523, 273 S.E.2d 36, 42-43 (1980), *cert. denied*, 451 U.S. 1011 (1981). This approach is in accord with the holding of the United States Supreme Court set forth in *Morgan*, ___ U.S. at ___, 112 S.Ct. at 2232-33.

In *Morgan*, the Court held that the defendant's right to a fair and impartial jury was violated by the trial court's refusal to inquire whether prospective jurors would vote automatically for imposition of the death penalty. The defendant had requested that the trial court ask the jurors: ''If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?'' ___ U.S. at ___, 112 S.Ct. at 2226.

In reaching its decision, the Supreme Court noted that the trial court had not asked any questions on this subject. Instead, it had only posed general questions regarding the prospective jurors' ability to be fair and impartial and follow the instructions of the court. The Supreme Court held that such general questions were inadequate because a prospective juror could, in good conscience, respond affirmatively and yet be unaware that certain beliefs about the death penalty would impede his or her performance as a juror. ___ U.S. at ___, 112 S.Ct. at 2226; 2232-33.

■ In the case before us, the trial court did ask questions which probed whether prospective juror Zoeckler would automatically vote for the death penalty. At the beginning of Zoeckler's individual voir dire, the following dialogue took place:

THE COURT: Do you have any moral or religious convictions that would prevent you from voting for the death penalty?

MR. ZOECKLER: No.

THE COURT: On the other hand of that if the Court instructed you also, and I will instruct you that one of the other penalties, a lesser penalty that you could consider is life imprisonment, could you fairly consider the lesser penalty in deciding on what penalties the defendant should receive, by punishment what he should receive?

MR. ZOECKLER: I could consider it, yes.

THE COURT: If the Court instructed you that it was death or life imprisonment, would you fairly consider life imprisonment as well as the death penalty?

MR. ZOECKLER: I don't know, no.

THE COURT: Let me see if I have got you right. First, if I instructed you that there are two penalties that you could punish the defendant for, one is the death penalty, you say you have no moral or religious convictions that would prevent you from voting for the death penalty?

MR. ZOECKLER: Right.

THE COURT: Also, if the Court instructed you that the life imprisonment was a lesser penalty, would you consider the lesser punishment?

MR. ZOECKLER: Yes, I would consider it.

In responding to the prosecutor's questions, Zoeckler reiterated this position, stating that he would not vote automatically to impose either sentence. In response to questions from Mueller's counsel, Zoeckler stated that he would wait to hear the evidence in the penalty phase before deciding which penalty to impose. Viewing Zoeckler's voir dire as a whole, we find that he was questioned sufficiently to determine whether he would automatically impose the death penalty. Therefore, we cannot say that the trial court abused its discretion in refusing to allow further questions which Mueller proposed. *See Morgan*, ___ U.S. at ___, 112 S.Ct. at 2232-33; *Turner*, 221 Va. at 523, 273 S.E.2d at 43; *LeVasseur*, 225 Va. at 584, 304 S.E.2d at 655.[4]

---

[4] Mueller also contends that the trial court erred in refusing to allow him to ask Theresa Gryder, who was eventually empaneled on the jury, the following question:

First you decide whether or not the person is guilty or innocent, so given that you have already decided that, okay, and you have determined that he, in fact, did abduct, rape and murder a 10 year old child, don't you feel then that the death sentence would be the only appropriate punishment?

Because Mueller did not object to the trial court's determination that Gryder was qualified to serve on the jury, he has not preserved his right to challenge this determination. *See Morgan*, ___ U.S. at ___, 112 S.Ct. at 2229; Rule 5:25.

## B. Refusal to Disqualify Venire.

Mueller contends that the comments of one venireperson improperly tainted the group and that the trial court erred in failing to disqualify the entire venire for this reason. During the trial court's questioning of the first group of 14 prospective jurors, David Clark told the court that another prospective juror, Helen Blackwell, stated in the jury waiting room that she had "some strong feelings about the innocence or guilt of the defendant." The trial court then asked the entire panel, "[H]ave any of you acquired any information about the alleged offense or the accused from news media or other sources, and if so, would that information affect your impartiality in the case?" The trial court postponed questioning of those who answered in the affirmative until the individual questioning of each prospective juror.[5]

When questioned individually, only Robert Mitchell referred to comments which he had overheard in the waiting room. Mitchell stated that he had heard another prospective juror say that Mueller had confessed. Another prospective juror, Ruby Moschler, stated that she had not overheard any prospective juror making statements in the waiting room.

At the end of the voir dire, the trial court asked the entire venire whether any member had heard anything since being questioned by the court which would change any answer he or she had given previously. No one answered in the affirmative.

■ Mueller cites no evidence to support his contention that the venire was tainted by the comments of Helen Blackwell. Further, the record reflects that both counsel had ample opportunity to question each prospective juror as to what he or she had heard, in the waiting room and elsewhere, about the case. This questioning revealed no evidence that Blackwell's comment had influenced or prejudiced the prospective jurors in any way. In fact, Mitchell, the only prospective juror who mentioned having heard Blackwell's comment, said that the statement he overheard was "a casual thing" and that it was "not important to me at that time."

The trial court is vested with discretion to determine whether the parties have had a "full and fair" opportunity to determine whether a juror "stands indifferent to the cause." *Buchanan*, 238 Va. at 401,

---

[5] The trial court excused Helen Blackwell for cause based on its determination that she had already formed an opinion in the case.

384 S.E.2d at 764; *LeVasseur*, 225 Va. at 581, 304 S.E.2d at 653. Since the answers to the questions posed by the trial court, as well as by counsel for both parties, indicated that none of the prospective jurors was affected by Helen Blackwell's statement, we hold that the trial court did not abuse its discretion in refusing to disqualify the entire venire.

## C. Refusal to Strike Prospective Jurors for Cause.

█ Mueller next argues that nine prospective jurors who had knowledge of his prior record or confession should have been stricken for cause. Our standard of review here is well-settled. Based on the trial court's ability "to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand," we will not disturb its rulings on challenges for cause, unless there is manifest error. *Pope* v. *Commonwealth*, 234 Va. 114, 123-24, 360 S.E.2d 352, 358 (1987), *cert. denied*, 485 U.S. 1015 (1988). In making this determination, we decide whether the voir dire as a whole shows that a juror's performance of his or her duty, in accordance with the trial court's instructions and the oath taken, would be prevented or substantially impaired. *Adams*, 448 U.S. at 45; *Eaton*, 240 Va. at 246, 397 S.E.2d at 391; *George*, 242 Va. at 276, 411 S.E.2d at 19.

Additionally, we observe that jurors need not be totally unaware of the facts and issues involved in the case. *Irvin*, 366 U.S. at 722. This is true even in instances where a juror has previous knowledge of a defendant's past crimes and of the current charge against the defendant. *Murphy* v. *Florida*, 421 U.S. 794, 800 (1975).

In the case before us, the trial court initially questioned the prospective jurors collectively concerning whether (1) there was anything which would prejudice them against either party, (2) they were aware of any bias or prejudice against either party, and (3) they understood that a defendant is presumed to be innocent until the prosecution proves his guilt beyond a reasonable doubt.[6] Additionally, each prospective juror was questioned individually by the trial court and counsel for both parties to determine whether pretrial publicity had caused him or her to be biased.

---

[6] Donald Meincke and Dale Morris were questioned individually regarding the presumption of innocence and the prosecution's burden of proof beyond a reasonable doubt.

### Raymond LaFountain

In response to a question by Mueller's counsel, Raymond LaFountain stated that he had heard from television reports that Mueller had been charged with the crime, that Charity's body had been found near Mueller's home, and that Mueller had made a confession to the police. However, LaFountain stated that he had not formed an opinion as to Mueller's guilt or innocence. LaFountain also noted that he did not "know a whole lot about [the case] other than the fact that the news has said this happened, this gentleman was accused, and so forth." LaFountain was unaware of Mueller's prior criminal record.

### Cynthia Woods

Cynthia Woods stated she had seen television reports and read newspaper articles which discussed the crime and Mueller's arrest. She also stated, "I think he had a record," but she did not remember any details. Woods, an eighth grade teacher, also told Mueller's counsel that, to a limited extent, she had discussed the case with her students. Woods stated that she did not know much about the defendant, that she had "not been around this summer," and that she had not formed an opinion regarding Mueller's guilt or innocence.

### Max Zoeckler

Max Zoeckler stated he had heard media reports concerning Charity's disappearance and the discovery of her body. He did not recall hearing anything about Mueller's connection with the case, other than "[i]t may been [sic] that he had some prior acquaintanceship with the little girl." Zoeckler further stated that he had not formed an opinion regarding Mueller's guilt or innocence.

### Patricia Squire

In response to questioning by the prosecutor, Patricia Squire stated she had heard in media reports that Mueller had been arrested and she recalled "there had been another point in which he had similar charges." Squire also had heard that the victim's body had been

dismembered.[7] Upon further questioning by the prosecutor whether she had formed an opinion regarding Mueller's guilt or innocence, based on what she had seen or heard from the media, Squire responded, "I felt like he had evidence that very much swayed towards him being guilty. . . . In terms of myself deciding whether he is guilty or not, no, I have not made any decision." She then reaffirmed this response by stating, "I haven't formed an opinion." She further stated that she would be able to put aside any information she had learned from the media and base her decision in this case on the evidence presented in court.

In response to a question posed by Mueller's counsel, Squire again stated that, based on the information she had obtained from the media, "it probably weighs heavily in terms of thinking he might be guilty." However, upon further questioning by Mueller's counsel, Squire stated that her previous knowledge of the case would not interfere with her ability to follow the trial court's instructions and that she could put the fact of Mueller's prior criminal convictions out of her mind. She also stated that her previously acquired knowledge would not interfere with her ability to apply a presumption of innocence in the case.

### Elizabeth Davis

Responding to a question from the trial court, Elizabeth Davis stated that all she had seen or heard in the media coverage of this case was the fact that Charity Powers had disappeared. Davis later responded to the prosecutor that she understood the presumption of a defendant's innocence, the prosecution's burden of proof of guilt beyond a reasonable doubt, and that she would apply the trial court's instructions to the evidence in making her decision. In response to a question from Mueller's counsel, Davis stated that, in conversations with co-workers about the case, she had heard that Mueller had confessed. However, Davis also stated that she had not formed an opinion regarding Mueller's guilt or innocence.

### Donald Meincke

Donald Meincke stated he had heard about the case in television and newspaper coverage, including reports that Mueller had been

---

[7] Squire was incorrect in her belief that the body had been dismembered.

arrested, had confessed his guilt, and that he previously had been convicted of other crimes. However, Meincke further stated that he could put aside what he had learned from the media, that he had not formed an opinion regarding Mueller's guilt or innocence, that he could base his decision on evidence heard in court, and that he could be impartial.

### Dale Morris

Dale Morris stated that he was aware of the case and Mueller's confession of guilt from television news reports. Morris indicated that he had not formed an opinion about Mueller's guilt or innocence and that he felt he could decide the case based entirely on the evidence presented in court.

### Robert Mitchell

Robert Mitchell stated he knew, based on media coverage, that Mueller was arrested for the murder of Charity Powers, but he did not "know that much as to what the evidence was that caused his arrest." Although Mitchell initially stated he believed, as a general rule, that a person is usually guilty if arrested, he later stated that he did not know the facts of the present case and had not formed an opinion regarding the guilt or innocence of Mueller.

### Ruby Moschler

Ruby Moschler stated she learned from media reports that Mueller had been arrested for the murder of Charity Powers. However, she did not remember anything else about Mueller and she said that she had formed no opinion regarding his guilt or innocence. Moschler further stated that, while she did not already feel that Mueller was guilty, she was "relieved that he ha[d] been arrested." Upon questioning by Mueller's counsel, Moschler responded that she would weigh the evidence presented in the courtroom to determine which penalty to impose, that she would consider both penalties, and that she had no fixed opinion regarding Mueller's guilt.

In our review of the whole voir dire testimony of each of these nine prospective jurors, we find no indication that each could not "lay aside [his or her] impressions or opinions and render a verdict based on the evidence presented in court." *Pope*, 234 Va. at

124, 360 S.E.2d at 358. Accordingly, we find no error in the trial court's refusal to strike each of them for cause. *Id.*

## VI.

### GUILT PHASE — MOTION FOR MISTRIAL

Mueller contends that he was entitled to a mistrial based on the prosecutor's failure to inform him that witness Kevin Speeks had not made a positive identification of him when shown a photo array consisting of seven pictures. The record is silent, however, regarding whether Mueller's photograph was among the seven photographs shown to Speeks. Nevertheless, Mueller argues that Speeks's failure to identify him was exculpatory evidence within the meaning of *Brady* v. *Maryland,* 373 U.S. 83 (1963). We disagree.

Exculpatory evidence is evidence favorable to a defendant which must be disclosed by the prosecution where it is material to the defendant's guilt or punishment. *Id.* at 87. The record before us shows that the prosecutor informed the trial court that he had investigated the matter of the photo array upon learning about it for the first time at trial. He was unable to determine which police officer showed Speeks the photographs. Thus, there is no evidence before us that Speeks was shown a photograph of Mueller or of any specifically identified individual. Moreover, since Speeks did not identify any photograph as representing a person he had seen at the fast food restaurant, but merely stated that one photograph *resembled* a man who was there, the trial court correctly determined that this information did not constitute exculpatory evidence. *Townes* v. *Commonwealth*, 234 Va. 307, 324, 362 S.E.2d 650, 659 (1987), *cert. denied*, 485 U.S. 971 (1988).

## VII.

### PENALTY PHASE

A. Parole Ineligibility.

Mueller argues that the trial court violated his due process rights by refusing to instruct the jury that, pursuant to Code § 53.1-151(B1), he would not be eligible for parole if convicted of the rape of Charity Powers, since this would be his third rape conviction. He also asserts that he should have been allowed the opportunity to

introduce evidence regarding parole ineligibility in mitigation of punishment at the penalty phase of the trial.

We hold that the trial court did not err in its rulings here. This Court has held uniformly and repeatedly that information regarding parole eligibility is not relevant for the jury's consideration. *King* v. *Commonwealth*, 243 Va. 353, 367-68, 416 S.E.2d 669, 677 (1992); *Eaton*, 240 Va. at 248-49, 397 S.E.2d at 392-93; *Watkins* v. *Commonwealth*, 238 Va. 341, 351, 385 S.E.2d 50, 56 (1989), *cert. denied*, 494 U.S. 1074 (1990). Further, the United States Supreme Court has expressly left the determination of this question to the individual states, as a matter of state law. *California* v. *Ramos*, 463 U.S. 992, 1013-14 (1983); *Eaton*, 240 Va. at 249, 397 S.E.2d at 392-93. We perceive no reason in the case before us to depart from our prior rulings on this subject.

We find no merit in Mueller's contention that, notwithstanding the prior rulings of this Court, he should have been permitted to present evidence of parole ineligibility because two of the Commonwealth's witnesses referred to his prior parole history in their testimony during the penalty phase of the trial. In *Pope*, 234 Va. at 126-27, 360 S.E.2d at 360, this Court held that evidence of a defendant's prior parole history is admissible during the penalty phase of a capital murder trial, where the Commonwealth is seeking the death penalty based on the "future dangerousness" predicate. This Court explained that, under Code § 19.2-264.4, the jury is required, prior to imposing the death penalty based on a finding of future dangerousness, to consider the defendant's "prior history." The fact that a defendant has had the benefit of parole supervision is part of this prior history. *See id.* Thus, this Court has drawn a clear distinction between the admissibility of a defendant's parole history and evidence of his future parole eligibility.

B. Cross-Examination of Mueller.

Mueller argues that the trial court erred in permitting the Commonwealth to question him about his prior convictions for sexual assault, as well as the present offenses against Charity Powers. We disagree. During his direct testimony, Mueller acknowledged that he had prior convictions for sexual offenses and he stated that he was refused parole repeatedly because of these convictions. Mueller also testified on direct examination about the circumstances under which

his life had deteriorated and he related the fact that he had spent two years in a California state hospital.

█ Once a defendant has testified as to certain matters, the proper scope of cross examination lies within the sound discretion of the trial court. *See Savino* v. *Commonwealth*, 239 Va. 534, 545, 391 S.E.2d 276, 282, *cert. denied*, 498 U.S. ___, 111 S.Ct. 229 (1990). Considering the above testimony, we find that the trial court did not abuse its discretion in allowing the Commonwealth to question Mueller about his prior convictions for sexual offenses and about whether he had learned anything as a result of his commission of the present offenses.

## C. Admissibility of Dr. Fierro's Testimony.

█ Mueller contends that portions of the testimony of Dr. Marcella Fierro, who conducted the autopsy of the victim's body, should not have been admitted because they included opinion evidence which was not stated to a reasonable degree of medical certainty. However, Mueller does not identify the portions of Dr. Fierro's testimony which he claims were admitted improperly. Further, the record shows that, during Dr. Fierro's testimony in the guilt phase of the trial, Mueller made no objection to the fact that her opinions were not stated to a reasonable degree of medical certainty.[8] Accordingly, he may not complain on appeal regarding the admission of this opinion evidence. *Spruill* v. *Commonwealth*, 221 Va. 475, 478-79, 271 S.E.2d 419, 421 (1980); Rule 5:25.

During the penalty phase of the trial, the prosecutor questioned Dr. Fierro regarding certain photographs which depicted the condition of the victim's body. At this point, Mueller did object to Dr. Fierro's testimony. He argued that any opinion on her part regarding the cause of the injuries, as well as the cause of death, would not be admissible since it could not be stated to a reasonable degree of medical certainty.

█ This objection, however, was wholly inapposite to the testimony which Dr. Fierro gave at the penalty phase of the trial. Here,

---

[8] Although prior to Dr. Fierro's testimony, Mueller informed the court that the defense was "going to have objections to some of the things we think they are going to try to get in, because we don't think there is a reasonable degree of certainty," Mueller never made a contemporaneous objection based on Dr. Fierro's stated degree of certainty during her testimony in the guilt phase of the trial.

Dr. Fierro's testimony dealt only with descriptions of the photographs which the prosecution sought to introduce. Dr. Fierro gave no further testimony during the penalty phase of the trial. Since her testimony at this stage of the trial involved only a description of the condition of the body, as depicted in the photographs, it did not constitute opinion evidence and was properly admitted.

D. Sufficiency of Evidence of Vileness.

■ Mueller asserts that the evidence in this case was insufficient to meet the vileness predicate set forth in Code § 19.2-264.2. We disagree. A finding of vileness must be based on conduct which is "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Code § 19.2-264.2. Proof of any one of these three components will support a finding of vileness. *Id.*; *see Poyner* v. *Commonwealth*, 229 Va. 401, 424, 329 S.E.2d 815, 831, *cert. denied*, 474 U.S. 865 (1985). We hold that the testimony here sufficiently established Mueller's aggravated battery of the victim, as well as his depravity of mind.

■ First, the record demonstrates that Mueller perpetrated an aggravated battery on Charity Powers within the meaning of Code § 19.2-264.2. This Court has defined "aggravated battery" in this context to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979). Mueller stated that he strangled Charity to death after he raped her. Dr. Fierro testified, however, that Charity's throat had been cut and that a person suffering this type of wound would live for several minutes. We find that this evidence from Dr. Fierro is sufficient to establish an aggravated battery because the victim was subjected to "an interval of agony awaiting death." *Stout* v. *Commonwealth*, 237 Va. 126, 134, 376 S.E.2d 288, 292, *cert. denied*, 492 U.S. 925 (1989); *Edmonds* v. *Commonwealth*, 229 Va. 303, 313, 329 S.E.2d 807, 814, *cert. denied*, 474 U.S. 975 (1985).

■ The record before us also contains sufficient evidence to establish Mueller's depravity of mind. Depravity of mind can be established by proof of psychological torture of the victim. *Poyner*, 229 Va. at 425, 329 S.E.2d at 832. We find that the jury reasonably

could have inferred from the evidence that Charity Powers was tortured psychologically during the sequence of events which culminated in her murder. This ten year old child was alone late at night after being unable to find Steve Harris, who was supposed to have taken her home. Mueller offered to help her out of this frightening situation by telling her that he would take her home. Instead of keeping that promise, he took her into the woods, raped her, and then killed her. This conduct extended over a period of time and under such circumstances as to permit an inference of psychological torture. *See id.*

Further evidence of Mueller's depravity of mind is Dr. Fierro's testimony that there were holes in the breast area where the victim's nipples would have been and that she believed that this condition resulted from an injury inflicted on the victim. Evidence of such sexual mutilation, whether occurring before or after death, evinces a depravity of mind within the meaning of Code § 19.2-264.2. *See Jones* v. *Commonwealth*, 228 Va. 427, 447-48, 323 S.E.2d 554, 565-66 (1984), *cert. denied*, 472 U.S. 1012 (1985).

E. Verdict Form.

Mueller argues that the verdict form submitted to the jury did not properly inform it of the sentencing options. He contends that the structure of the verdict form influenced the jury to impose the death sentence rather than life imprisonment. We find no merit in this contention.

Instruction A informed the jury that it was required to choose between sentences of death and life imprisonment. This instruction also informed the jury that it could not sentence Mueller to death unless the prosecution proved beyond a reasonable doubt at least one of the two aggravating factors of vileness or future dangerousness. Further, Instruction A directed the jury that, even if the prosecution had proved one or both of these aggravating factors, it was nevertheless free to fix Mueller's punishment at life imprisonment, "if you believe from all the evidence that the death penalty is not justified."

Instruction B set forth four alternative verdicts: (1) a sentence of death based on a finding of both aggravating factors; (2) a sentence of death based on a finding of future dangerousness; (3) a sentence of death based on a finding of vileness; and (4) a life sentence based on all of the evidence in aggravation and mitigation of the offense.

To indicate its verdict, the jury was instructed to ''[c]ross out any paragraph, word or phrase which you do not find beyond a reasonable doubt.''

We hold that this sentencing form, in conjunction with Instruction A, fully apprised the jury of its sentencing options. The structure of the form did not, as contended by Mueller, favor any of the options presented. Further, since the jury was told in Instruction A that it could choose the penalty of life imprisonment, even if it found either or both aggravating factors, the information concerning the option of life imprisonment was complete. *See Stockton* v. *Commonwealth*, 241 Va. 192, 215, 402 S.E.2d 196, 209 (1991), *cert. denied*, 502 U.S. ___, 112 S.Ct. 280 (1991); *LeVasseur*, 225 Va. at 594-95, 304 S.E.2d at 661.

## VIII.

### SENTENCE REVIEW

Code § 17-110.1(C) requires us to review the imposition of the death sentence on Mueller, based on the trial record, to determine whether (1) it was imposed under the influence of passion, prejudice, or any other arbitrary factor; or (2) it is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Initially, we note that Mueller does not contend that the death sentence was imposed under the influence of any of the above statutory factors, nor does he contend that the sentence is excessive or disproportionate to the penalty imposed in similar cases. Nevertheless, we have examined the records of all capital murder cases reviewed by this Court, pursuant to Code § 17-110.1(E), giving particular attention to those cases where the death penalty was based upon both the ''future dangerousness'' and the ''vileness'' predicates. Those cases are collected in *Spencer* v. *Commonwealth*, 238 Va. 295, 319-20, 384 S.E.2d 785, 800 (1989), *cert. denied*, 493 U.S. 1093 (1990) (Spencer II). Since *Spencer II*, we have decided several other capital murder cases where the death penalty was based on both predicates: *George* v. *Commonwealth*, 242 Va. 264, 411 S.E.2d 12 (1991), *cert. denied*, 503 U.S. ___, 112 S.Ct. 1591 (1992); *Strickler* v. *Commonwealth*, 241 Va. 482, 404 S.E.2d 227, *cert. denied*, 502 U.S. ___, 112 S.Ct. 386 (1991); *Quesinberry* v. *Commonwealth*, 241 Va. 364, 402 S.E.2d 218, *cert. denied*, 502 U.S. ___, 112 S.Ct. 113 (1991); *Stockton* v. *Commonwealth*, 241 Va.

192, 402 S.E.2d 196 (1991), *cert. denied*, 502 U.S. ___, 112 S.Ct. 280 (1991); *Spencer* v. *Commonwealth*, 240 Va. 78, 393 S.E.2d 609, *cert. denied*, 498 U.S. 908, 111 S.Ct. 281 (1990) (Spencer IV); *Mu'Min* v. *Commonwealth*, 239 Va. 433, 389 S.E.2d 886 (1990), *aff'd*, 500 U.S. ___, 111 S.Ct. 1899 (1991); *Smith* v. *Commonwealth*, 239 Va. 243, 389 S.E.2d 871, *cert. denied*, 498 U.S. 881 (1990); *Spencer* v. *Commonwealth*, 238 Va. 563, 385 S.E.2d 850 (1989), *cert. denied*, 493 U.S. 1093 (1990) (Spencer III); *Watkins* v. *Commonwealth*, 238 Va. 341, 385 S.E.2d 50 (1989), *cert. denied*, 494 U.S. 1074 (1990).

After reviewing these records, as well as cases in which life imprisonment was imposed, we conclude that Mueller's sentence of death was neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in Virginia for crimes of a similar nature. In fact, few of these cases equal or exceed both the vileness of this crime or the future dangerousness of this defendant.

As stated above, this case involves the rape, abduction, and murder of a ten year old child. Even under Mueller's account of the events, the victim suffered an exceedingly gruesome and painful death. The evidence of Mueller's future dangerousness was also overwhelming. Prior to these crimes, Mueller had committed several violent sexual assaults on women, including assaults on two of his own sisters. He testified that he did not feel remorse after committing two of those crimes. In addition to the testimony of Dr. Henry Gwaltney, the Commonwealth's expert witness, Mueller's own expert witness, Dr. Mariah Travis, testified that Mueller is an extremely dangerous person.

Finally, based on our review of the record, we find nothing which suggests that Mueller's death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor.

## IX.

## CONCLUSION

We find no reversible error in the issues presented here. Having reviewed Mueller's sentence of death pursuant to Code § 17-110.1, we decline to commute the sentence. Accordingly, we will affirm the judgments in both cases.

Record No. 920287 - *Affirmed.*
Record No. 920449 - *Affirmed.*

## VIRGINIA:

In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on Friday, the 6th day of November, 1992.

Nidia Toro,          Appellant,

against        Record No. 920119
               Circuit Court No. L-16480-RW

Jacquelyn Batten,          Appellee.

Upon an appeal from a judgment rendered in the Circuit Court of the City of Newport News on the 29th day of October, 1991.

Upon consideration of the record, the briefs, and the argument of counsel, the Court is of opinion that the judgment appealed from is erroneous because the trial court erred in admitting into evidence the documents in question. (Assignments of Error 2 and 3). Accordingly, the judgment is reversed and annulled, and the case is remanded to the said circuit court for a new trial.

This order shall be certified to the said circuit court.

A Copy,
Teste:

*/s/ David B. Beach*
Clerk

JUSTICE COMPTON, dissenting.

In this action seeking recovery for personal injuries arising from an automobile accident, appellant Nidia Toro sued appellee Jacquelyn Batten, alleging that the defendant was negligent in the operation of her motor vehicle, which collided with the rear of the plaintiff's vehicle. The case was submitted to a jury on the issue of damages only. The jury returned the following verdict: "We, the

jury, do not find the plaintiff sustained any damages from the accident . . . and thus find our verdict in favor of the defendant.'' The trial court entered judgment on the verdict.

A majority of this Court reverses the judgment below on the ground that the trial court erroneously admitted two documents into evidence: a purported chiropractic treatment record and a document containing a typewritten interpretation of handwriting on the document. I will assume, *arguendo*, that the admission of the exhibits was error. Nevertheless, I believe that the admission was harmless, rather than prejudicial, error.

The defendant's vehicle sustained no damage in the accident and the plaintiff's vehicle sustained only minor damage. The plaintiff made no complaints of injury at the time; both parties drove themselves from the scene without calling the police or summoning any medical assistance.

The plaintiff sought no medical treatment for over two months after the accident; her first treatment was not from any of several available physicians but was from a chiropractor. A friend of the plaintiff testified that the plaintiff admitted she had not been hurt in the accident, but said that she intended to file a lawsuit anyway because she saw ''an opportunity to make some money.'' The plaintiff attempted to justify her actions in making a false claim by saying, ''Everyone does it.'' In addition, there was testimony that the uninjured plaintiff told the witness that she was seeing a chiropractor who would help her find a physician who would support her claim of disability. There was abundant other evidence which established that the plaintiff was making a false claim.

The documents ruled inadmissible by the majority contained information that bore on the plaintiff's credibility. In my opinion, and ignoring the challenged documents, the jury was presented with overwhelming evidence that the plaintiff was not injured in the accident in question. In this case, it plainly appears from the record and the evidence received at the trial that the parties have had a fair trial on the merits and that substantial justice has been reached; thus, the judgment should not be reversed for any error committed during the trial. Code § 8.01-678.

Consequently, I would affirm the judgment of the trial court.

**VIRGINIA:**

In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on Friday, the 6th Day of November, 1992.

International Union, United Mine
Workers of America, et al.,                                    Appellants,

against               Record No. 920465
                      Circuit Court No. CH71-10809

Covenant Coal Corp., et al.,                                  Appellees.

Upon an appeal from judgments rendered in the Circuit Court of Tazewell County on the 13th day of June, 1989, and on the 23rd day of June, 1989.

An appeal from these judgments rendered in the said circuit court was perfected in the Court of Appeals of Virginia. At the suggestion of the court of appeals and by order entered the 6th day of April, 1992, this Court certified the case for review. Code § 17-116.06.

Upon consideration of the record, the briefs, and the argument of counsel, the Court finds that the errors urged on appeal to the rulings of the circuit court were not the subject of objections stated with reasonable certainty at the time of the rulings. Rule 5:25. Accordingly, the Court grants the appellees' motion and dismisses the appeal.

This order shall be certified to the said circuit court.

A Copy,
            Teste:

*/s/ David B. Beach*