COURT OF APPEALS OF VIRGINIA


Present: Judges Elder, Annunziata and Frank
Argued at Alexandria, Virginia


TRAVIS JOE McLEAN
                                              OPINION BY
v.    Record No. 0145-99-4            JUDGE LARRY G. ELDER
                                           APRIL 18, 2000
COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                Herman A. Whisenant, Jr., Judge

        David B. Hargett (Joseph D. Morrissey;
        Morrissey & Hershner, PLC, on brief), for
        appellant.

        John H. McLees, Jr., Assistant Attorney
        General (Mark L. Earley, Attorney General, on
        brief), for appellee.


     Travis Joe McLean (appellant) appeals from his jury trial

convictions for two counts each of attempted capital murder,

attempted robbery, and use of a firearm in the commission of a

felony.  On appeal, he contends the trial court committed

reversible error by admitting, in the guilt phase of the trial,

(1) evidence that one of the Commonwealth's witnesses felt

intimidated when approached by appellant's father and (2) a

letter written by that same witness on the theory that it was a

prior consistent statement admissible following appellant's

attempt to impeach him.  We hold, as the Commonwealth concedes,

that the trial court erred in admitting evidence that the

witness felt intimidated, but we hold that error was harmless under the facts of this case.

We also hold that appellant sufficiently preserved his objection to admission of the witness' letter as a prior consistent statement but that the admission was not error. Therefore, we affirm appellant's convictions.

I.

FACTS

THE OFFENSE

At about 8:00 p.m. on December 19, 1997, victims Robert Umholtz and Robert Webb were standing between Umholtz's residence and a nearby swimming pool parking lot. A man matching appellant's general description approached Umholtz and Webb from the direction of the pool, pointed a revolver at them and demanded their wallets. When they refused and turned to walk away, the assailant shot them both. Umholtz was struck once in the leg. Webb was struck once in the back, and when he turned to again face the assailant, he was struck two more times, in his upper right chest and lower left hip or groin area. The assailant turned and walked briskly back toward the pool in the direction of Old Bridge Road. The victims' wounds were not fatal, but neither man was able to make a positive identification of the assailant.

Two other witnesses, Terrence Tyrone Alexander and Calvin Jackson, testified that they were driving around with appellant

on the evening of December 19, 1997, and they gave similar testimony about the events of that evening.  Appellant was driving.  Also in the car with appellant, Alexander and Jackson was appellant's brother, Lamar.  They "ended up going to Old Bridge . . . where [appellant and his brother, Lamar,] used to live."  After visiting a friend of appellant's and Lamar's, appellant drove into a nearby townhouse development and pulled into a parking space near the swimming pool adjacent to Umholtz's house.  Appellant told the other occupants of the car "that he would be right back," and he walked off in the direction of the swimming pool.  Lamar, who was in a hurry to finish an errand, moved into the driver's seat to await appellant's return.  Although the subject was not discussed, Alexander assumed appellant was stopping to visit another friend.

Within thirty to forty-five seconds, Alexander and Jackson heard three or four gunshots, and shortly thereafter, appellant ran back to the driver's side of the car.  Upon seeing his brother in the driver's seat, appellant went to the passenger's side and got in.  When everyone asked what happened, appellant said "he tried to rob two men, and they refused by saying that they wouldn't give him the money -- they wouldn't give him the money if they had it.  So he shot them."  Jackson became very upset, cursing and yelling at appellant, and appellant said "he was sorry, that he didn't mean to do it.  He should have did it

by himself.  He put us in a bad position.  We have all got kids.
He was frustrated."  Appellant's brother then backed out of the
parking space and left the area.  As they pulled out, Alexander
saw a person lying on the ground in the area from which the
gunshots had come.

Lamar then completed his errand, and the men stopped to
purchase beer and went home.  Shortly thereafter, Alexander and
Jackson walked to the nearby home of friend Winston Griffith,
where appellant eventually arrived, as well.  Appellant still
had the gun with him.  He asked Griffith if he had a bag that
appellant could put the shells in and said he wanted to flush
them down the toilet.  Griffith became irate and told him to
leave.

Howard Latrell, appellant's cellmate following his arrest
for these offenses, testified appellant admitted committing the
attempted robberies and shootings.  Latrell's testimony was
consistent with Alexander's and Jackson's testimony about how
the events occurred, what vehicle appellant was driving, and
what appellant reported he said and did afterward.

REHABILITATION OF ALEXANDER WITH PRIOR CONSISTENT STATEMENT

Counsel for appellant cross-examined Alexander about the
statements appellant made when he got back into the car
immediately after the shooting:

> [APPELLANT'S COUNSEL]:  . . . [Y]ou
> indicated in responding to [the prosecutor],
> I believe, that [appellant] made a statement

when he got back into the car and you were
all in the car, that he said he should have
done it alone.  Is that your statement here
today?

[ALEXANDER]:  Yeah, I mean --

[APPELLANT'S COUNSEL]:  All right.  Now,
again, directing your attention to your
previous testimony at the preliminary
hearing.  Didn't you say . . . in answer to
the question, "Did [appellant] say anything
about that as he did it?"  And you responded
in part, "He said -- he kept telling us he
was sorry, that he didn't really intend to
do it."

[ALEXANDER]:  That's what he said.

On re-direct examination, the Commonwealth sought to

clarify Alexander's testimony regarding what appellant said

about the shooting immediately afterward:

[PROSECUTOR]:  Now, [appellant's counsel]
also asked you about what [appellant] said
to you about he was sorry and whether he
shouldn't have done it.
     I'd like for the ladies and gentlemen
of the jury to hear your complete answer in
response to that.  You see the question to
you, "Did [appellant] say anything about
that as he did it?"
     Will you read your full answer please.

[ALEXANDER]:  "He said -- he kept telling us
he was sorry, that he didn't intend to do
it.  Calvin basically was really upset at
him, saying he wanted to beat him up and
stuff of that sort.  And [appellant] told
him, you know, go ahead and do it.  He
didn't mean to do it.  He was sorry.  He had
put us in a bad situation, he was sorry he
had put us in that position."

                *    *    *    *    *    *    *

        [PROSECUTOR]:  And the next question was,
        "[Appellant] said he was sorry he put who in
        that position?"  Your response?

        [ALEXANDER]:  "Put the three of us that were
        in the car with him."

        [PROSECUTOR]:  Your testimony today was that
        he said he should have done it on his own?

        [ALEXANDER]:  (Nodding head.)

    Also on re-direct, the prosecutor attempted to introduce

into evidence a letter that Alexander wrote to his mother on

January 12 or 13, 1998, shortly before he was contacted by and

spoke to police about the events of December 19, 1997.  The

police noticed the letter when they arrived to interview him,

and they asked him to sign and date it.  Counsel for appellant

objected to admission of the letter as follows:

        [I]t exceeds the scope of the cross
        examination. . . . [M]y recollection is that
        there was no cross examination regarding
        statements that this witness made to the
        police.  And I gather the theory for trying
        to get around my objection is that he is
        trying to address the issue of an
        inconsistent statement.  And there was
        questions and answers upon cross examination
        relating to a possible prior inconsistent
        statement, but it wasn't in this area at
        all.

The prosecutor responded that the statement was admissible as a

prior consistent statement to rebut appellant's "attempts" to

impeach Alexander with prior, purportedly inconsistent

statements.  "There are three specific incidences that I alluded

to in my redirect already, specifically about the time about

when and where he saw the gun, any cartridge or cartridge casings, and what [appellant] had to say about all that." (Emphasis added). He also argued that the statements were made at a time when Alexander had no motive to fabricate. The court admitted the letter, and Alexander read it into the record without further substantive objection from appellant. Appellant did not ask to have any portions of the letter redacted and did not request a limiting instruction to prevent the jury from considering the statements contained in the letter as substantive evidence.

The letter corroborated Alexander's testimony about appellant's statements following the shooting, reporting that appellant admitted the shootings and said, "'I should not have done this. I should have done this on my own. I shouldn't have done this with [Jackson] and [Alexander]. . . . Ya'll got kids and stuff.'"

EVIDENCE OF ALLEGED WITNESS INTIMIDATION

Alexander testified that, both before and after the shooting, he worked alone on the night shift at a local gas station. Appellant never visited Alexander at the gas station before the shooting, but after December 19, appellant and his girlfriend routinely came to the gas station while Alexander was working and would stay "for a long time[,] . . . into the wee hours in the morning." On a couple of those occasions,

Alexander and appellant talked about the shooting and how appellant had obtained and disposed of the weapon.

In response to questioning by the Commonwealth about whether any of appellant's family members came to the gas station while Alexander worked the late shift, Alexander testified that appellant's father came by once. When Alexander started to testify about what appellant's father said, counsel for appellant objected on hearsay grounds. The Commonwealth then proceeded to ask how Alexander felt when appellant's father came by the gas station late at night. The following exchange took place, presumably in the presence of the jury:

> [APPELLANT'S COUNSEL]: I would object to the relevance. This isn't probative of any pertinent issue in the case. I would object on the grounds of relevancy.
>
> THE COURT: Do you wish to respond, [prosecutor]?
>
> [PROSECUTOR]: Well, Your Honor, I think that there's already evidence before the Court of concealing evidence in the case. And certainly that shows a consciousness of guilt. I would suggest to the Court that if anyone else made any attempts at intimidation of the witnesses, that would likewise show a consciousness of guilt. That would be the purpose for the --
>
> THE COURT: I'll allow the question. Go ahead.

The Commonwealth again asked Alexander how the visit by appellant's father made him feel. Alexander answered, "Pretty

much intimidated.  I mean, you know, when somebody --."  The prosecutor cut him off before he completed his sentence.

On re-direct examination, Alexander testified that he and his family had known appellant for years and were on good terms with him and that appellant spent a lot of time with Alexander's young son.  Alexander testified that he was reluctant to come forward with what he knew about the shooting out of fear for the safety of his family and son:

> [I]f something were to make [appellant] even
> think that somebody had said something, I
> stayed right down the street from him, you
> know.  I work a lot.  I don't want to go as
> far as to say he would have harmed my family
> or something like that.  But after he did
> what he did, anything could happen, you
> know.  That's how I'm looking at it.
> Anything could happen.

The prosecutor made no direct reference in his closing argument to the evidence regarding appellant's father's allegedly intimidating visit to his place of employment.  His only indirect reference was in explaining why Alexander may not have come forward voluntarily:

> It's certainly not hard to consider
> what it must be like to have information of
> heinous crimes like these having been
> perpetrated by someone that you know,
> someone that you've hung out with, someone
> that you may have known from the
> neighborhood for a long time, someone that
> you may have some fear of.

The jury was instructed on attempted capital murder and attempted second degree murder, attempted robbery, and use of a

firearm in an attempted murder.  The jury convicted appellant of two counts of attempted capital murder and two counts each of the attempted robbery and firearm offenses.

## II.

## ANALYSIS

## A.

## ADMISSIBILITY OF INTIMIDATION EVIDENCE

Appellant contends the trial court erroneously admitted evidence that Terrence Alexander, a Commonwealth's witness, felt "intimidated" when appellant's father visited him late one night at the gas station at which he worked alone.  The Commonwealth concedes on brief that the admission of this evidence was error. We agree.

"Evidence that a person charged with a crime procured, or attempted to procure, the absence of a witness, or to bribe or suppress testimony against him, is admissible, as it tends to show the unrighteousness of the defendant's cause of action and a consciousness of guilt."  McMillan v. Commonwealth, 188 Va. 429, 432-33, 50 S.E.2d 428, 430 (1948); see Ragland v. Commonwealth, 16 Va. App. 913, 920, 434 S.E.2d 675, 679 (1993). In contrast, "[e]vidence of [witness] tampering by a third party . . . is only admissible where such third party is acting with the authority, or the knowledge and consent, of the accused. The privity of the accused to such conduct must be proven before

such evidence is admissible." McMillan, 188 Va. at 433, 50

S.E.2d at 430 (emphasis added).

Here, no evidence proved that appellant was responsible for or aware of his father's presence at Alexander's workplace; therefore, the Commonwealth failed to prove an essential predicate that would allow the jury to infer a consciousness of guilt. Further, the only evidence in the record is that Alexander felt threatened. The record contains no indication of what appellant's father said or did, other than being present, which Alexander may have found intimidating. Therefore, the trial court erred in admitting this evidence.

The Commonwealth nevertheless contends that the erroneous admission of this evidence was harmless because it was not linked directly to appellant, because other evidence clearly showed appellant's consciousness of guilt, and because the evidence of appellant's guilt as a whole was overwhelming. We agree.

> In Virginia, non-constitutional error is harmless "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678 (emphasis added). "[A] fair trial on the merits and substantial justice" are not achieved if an error at trial has affected the verdict. Consequently, under Code § 8.01-678, a criminal conviction must be reversed unless "it plainly appears from the record and the evidence given at the trial that" the error did not affect the verdict. An error does not affect a verdict if a reviewing court

> can conclude, without usurping the jury's
> fact finding function, that, had the error
> not occurred, the verdict would have been
> the same.

Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d
910, 911 (1991) (en banc).

An error is harmless (1) if "other evidence of guilt is 'so
overwhelming and the error so insignificant by comparison that
the error could not have affected the verdict,'" or, "even if
the evidence of the defendant's guilt is not overwhelming, [(2)]
if the evidence admitted in error was merely cumulative of
other, undisputed evidence." Ferguson v. Commonwealth, 16 Va.
App. 9, 12, 427 S.E.2d 442, 444-45 (1993) (quoting Hooker v.
Commonwealth, 14 Va. App. 454, 458 n.2, 418 S.E.2d 343, 345 n.2
(1992)).

Both theories establish the harmlessness of the error in
appellant's case. First, the only testimony or argument on this
issue was Alexander's testimony that he felt intimidated when
appellant's father visited his place of work late one night when
Alexander was working alone. The factors which rendered the
evidence inadmissible also limit its potential for harm because
no evidence established that appellant had anything to do with
his father's visit, the prosecutor made no such argument, and
other evidence established appellant's consciousness of guilt.
Evidence to which appellant posed no objection established that
Alexander had significant contact with appellant after the

shooting and told appellant how his girlfriend disposed of the gun used to commit the crimes.  After the shooting, appellant and his girlfriend, who never visited Alexander at work before the shooting, came to the gas station routinely and stayed for long periods of time.  Although Alexander did not testify that appellant had threatened him, he explained that appellant lived close to Alexander's family and young son and had significant contact with them and that Alexander was afraid of what appellant might have been capable of doing to them if he became angry with Alexander for talking to the authorities.  This evidence significantly diminished the harmfulness of the testimony about appellant's father.

Second, the evidence of appellant's guilt on the charged offenses was overwhelming.  Alexander and Jackson, who were traveling with appellant on the night of the shootings, testified that they heard the gunshots in the area where the victims said they were shot and that appellant confessed the shootings to Alexander and Jackson when he ran back to the car. Both men saw the weapon in appellant's possession, and Alexander saw one of the victims lying on the ground as the car in which they were traveling left the area.  The version of events appellant gave to Alexander and Jackson was also consistent with the victims' testimony.  Howard Latrell, appellant's cellmate after his arrest for the charged offenses, testified that appellant confessed the crimes to him, as well.  Latrell also

gave detailed testimony about the offenses, and no evidence in the record established that Latrell had any source of information about the crimes other than appellant. Latrell's testimony about the crimes was consistent with the testimony from Alexander, Jackson and the victims.

Because the erroneously admitted evidence was cumulative of other undisputed evidence and because the evidence of appellant's guilt was overwhelming, we hold the error was harmless.

B.

ADMISSIBILITY OF LETTER AS PRIOR CONSISTENT STATEMENT

The Commonwealth contends that appellant's objection in the trial court was insufficient under Rule 5A:18 to preserve the issue he raised on appeal. We disagree. Upon objecting to the Commonwealth's motion to admit Alexander's letter to his mother as a prior consistent statement, appellant argued to the trial court that "there was [sic] questions and answers upon cross-examination relating to a possible prior inconsistent statement, but it wasn't in this area at all. So I think I would ask Your Honor to grant that objection." The prosecutor then detailed the three areas in which appellant had attempted to impeach Alexander and argued that the letter was admissible in response to those efforts as a prior consistent statement.

On appeal, appellant asserts that the trial court erred in admitting the letter because appellant did not offer any prior

inconsistent statements for impeachment and "merely attempted," without success, "to impeach Alexander's testimony." He also asserts that the letter did not fit into any of the exceptions authorizing admission of prior consistent statements. We hold that appellant's objection in the trial court was sufficiently broad to preserve for appeal the question whether his cross-examination of Alexander was sufficiently impeaching to permit admission of the letter. We also hold that the trial court did not abuse its discretion in admitting the letter into evidence as a prior consistent statement.

"As a general rule, a prior consistent statement of a witness is inadmissible hearsay." Faison v. Hudson, 243 Va. 397, 404, 417 S.E.2d 305, 309 (1992). However, a prior consistent statement is admissible under certain circumstances, such as "after a witness's testimony has been attacked by the admission of a prior inconsistent statement." Clere v. Commonwealth, 212 Va. 472, 473, 184 S.E.2d 820, 821 (1971). Such evidence also may be admitted when the opposing party "suggests that the declarant had a motive to falsify his testimony and the consistent statement was made prior to the existence of that motive . . . [or] alleges that the declarant's testimony is a fabrication of recent date and the prior consistent statement was made at a time when its ultimate effect could not have been foreseen." Mitchell v. Commonwealth, 25 Va. App. 81, 84-85, 486 S.E.2d 551, 552-53 (1997). Under each of

these circumstances, "the [prior consistent] statement is offered merely to show that it was made, rather than as proof of any matter asserted." Id. at 85, 486 S.E.2d at 553.

The introduction of a prior consistent statement of a witness is not admitted merely because the testimony of a second witness calls the veracity of the first witness into doubt. See Faison, 243 Va. at 405, 417 S.E.2d at 310 (fact that one witness' testimony about color of traffic light was contradicted by other witnesses did not constitute type of impeachment sufficient to permit introduction of that witness' prior consistent statement); Mitchell, 25 Va. App. at 85, 486 S.E.2d at 553 (fact that accused gave testimony contrary to that of victim did not permit Commonwealth to introduce prior consistent statement of victim). As we have recognized, "to allow the admission of a prior consistent statement after impeachment of just 'any sort' would create an unreasonably 'loose rule.'" Faison, 243 Va. at 405, 417 S.E.2d at 310 (quoting Gallion v. Winfree, 129 Va. 122, 127, 105 S.E. 539, 540 (1921)). Therefore, a prior consistent statement is admissible only where the testimony of the witness is impeached by use of a prior inconsistent statement, the witness is shown to have had a motive to fabricate, or the witness' testimony is alleged to have been recently fabricated.

We have not had occasion to consider the precise limits of the impeachment-by-prior-inconsistent-statement exception, i.e.,

how inconsistent a prior statement must be before a prior consistent statement may be admissible to rehabilitate the witness. However, our case law speaks in terms of "attack[s]" on, see Clere, 212 Va. at 473, 184 S.E.2d at 821, and "challenge[s]" to, see King v. Commonwealth, 18 Va. App. 57, 59, 441 S.E.2d 704, 705 (1994), the credibility of a witness. See also 1 Charles E. Friend, The Law of Evidence in Virginia § 4-12 (4th ed. 1993) (noting that prior consistent statements are admissible "when impeachment has been attempted by the introduction of a prior inconsistent statement" (first emphasis added)). Manifestly, as long as a party confronting a witness with an allegedly prior inconsistent statement challenges the credibility of that witness in any significant way, the trial court need not find that the impeachment was successful--that the fact finder would have no choice but to reject the testimony in its entirety--before permitting the introduction of a prior consistent statement for the purpose of rehabilitating that witness.

Here, the record establishes that appellant attempted to show portions of Alexander's trial testimony were inconsistent with his testimony at the preliminary hearing. At trial, regarding appellant's alleged statements when he returned to the car after the shooting, Alexander testified on direct examination that appellant said

            (1) appellant was sorry;
            (2) appellant did not mean to do it;
            (3) appellant put Alexander and the others
                in a bad position; and
            (4) appellant should have done it by
                himself.

On cross-examination, appellant's counsel re-established

Alexander's testimony on direct that appellant should have done

it by himself, labeled (4) above.  Counsel then inquired about

Alexander's testimony at the preliminary hearing, establishing

that Alexander testified only that (1) appellant said he was

sorry and (2) he did not intend to do it.  Thus, appellant's

counsel sought to demonstrate to the jury Alexander testified

originally that appellant said only that he was sorry and did

not intend to do it, permitting the inference that he believed

he should not have done it at all, but later testified that

appellant merely said he should have done it alone.  In short,

appellant's counsel attempted to impeach Alexander by

establishing that his preliminary hearing testimony was more

favorable to appellant than his trial testimony and that his

trial testimony, therefore, was inaccurate or untruthful.

     On re-direct examination, the prosecutor sought to

rehabilitate Alexander by having him read into the record the

entirety of his preliminary hearing testimony on this issue.

That process established that Alexander testified at the

preliminary hearing that appellant said (1) he was sorry, (2) he

did not intend to do it, and (3) he was sorry he put Alexander

and the other occupants of the car in a bad position.  Alexander

did not testify at the preliminary hearing that appellant said

(4) he should have done it alone.  Therefore, the prosecutor's

re-direct examination based on Alexander's preliminary hearing

testimony rehabilitated him only partially, as to statement (3)

above.  Alexander's letter to his mother, which was written less

than a month after the crimes and prior to the preliminary

hearing, was admissible to establish Alexander's prior

consistent statement that appellant also said (4) he "should

have done this on [his] own."  Thus, we hold that appellant's

cross-examination of Alexander established an inconsistency

between Alexander's preliminary hearing and trial testimony

which rendered admissible Alexander's prior consistent statement

on (4) above.[1]

For these reasons, we hold that the admission of the

challenged testimony that Alexander felt intimidated by

appellant's father was harmless error and that the trial court

did not abuse its discretion in admitting Alexander's letter to

---

[1] We note that appellant objected to the admissibility of
the letter in its entirety as not covering an area upon which
Alexander had made a prior inconsistent statement.  Appellant
did not request that the letter be redacted to exclude any
particular portions.  Appellant also did not request a limiting
instruction directing the jury to consider the letter only for
purposes of rehabilitation and not as substantive evidence.
Therefore, we do not consider whether the trial court's failure
to redact portions of the letter or to give the jury a limiting
instruction may have been error.  See Rule 5A:18; see also
Williams v. Commonwealth, 11 Va. App. 149, 154, 396 S.E.2d 860,
863 (1990) (limiting instruction).

his mother as a prior consistent statement.  Therefore, we affirm appellant's convictions.

<u>Affirmed.</u>
