UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Chafin and Senior Judge Clements
Argued at Richmond, Virginia


WILLIAM JOSEPH HUGHES

MEMORANDUM OPINION[*] BY
v.        Record No. 1983-14-4          JUDGE TERESA M. CHAFIN
                                        MAY 3, 2016

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Michael E. Levy, Judge

David B. Hargett (Hargett Law, PLC, on brief), for appellant.

Eugene Murphy, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


At the conclusion of a four-day trial held in the Circuit Court of Stafford County, a jury

convicted William Joseph Hughes of first-degree murder in violation of Code § 18.2-32.  On

appeal, Hughes argues that the circuit court erred by admitting testimony from a detective

concerning motorcycle clubs and their culture.[1]  Specifically, Hughes contends that the circuit

court erred by "permitting the witness to testify about the culture [and] history . . . of one

percenters, Hell's Angels, Warlocks and their outlaw nature."  Hughes claims that such

testimony was irrelevant, inflammatory, and highly prejudicial to his case.  For the reasons that

follow, we affirm Hughes's conviction.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] In Hughes's sole assignment of error, he also contends that the circuit court erred by "declaring [the detective] to be an expert in motorcycle clubs and one percenters."  Hughes did not argue this point at trial, and on appeal he has failed to provide any authority or argument concerning the detective's qualification as an expert on these subjects.  Therefore, we deem this specific argument waived and only address Hughes's argument concerning the relevance and prejudicial effect of the challenged testimony.  See Rules 5A:18 and 5A:20.

# I. BACKGROUND[2]

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)). So viewed, the evidence established that Jason Plaster disappeared in July 2007. Police found his body in 2013 after Dennis Benzie told them that Hughes killed Plaster near Benzie's house and buried him there.

At Hughes's trial, Benzie and Stuart Sullivan testified that Hughes killed Plaster because he made sexual advances toward Hughes's wife and daughter. Hughes, Benzie, and Sullivan each participated in the murder. The three men devised a plan to lure Plaster to Benzie's secluded property and kill him there. Pursuant to this plan, Hughes and Sullivan brought Plaster to Benzie's property to look at a motorcycle. After the men looked at the motorcycle, Benzie suggested that they go into the woods surrounding his home to dig up some guns he had hidden. At some point after the men entered the woods, Hughes shot Plaster in the chest with a derringer pistol. Sullivan then shot him with a .9 mm pistol. The men covered Plaster's body with lime and buried it in the woods. Later, Benzie drove Plaster's car away from his property and abandoned it in a high-crime area, leaving its keys in the ignition to encourage someone to steal the car.

Hughes challenged the credibility of Benzie and Sullivan by cross-examining them about the benefits they received for implicating him in the murder and testifying against him. Benzie testified that he had entered into an immunity agreement with the Commonwealth that shielded

---

[2] Because the parties are fully conversant with the record in this case and this memorandum opinion carries no precedential value, we recite only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

him from prosecution for murder charges related to Plaster's death. Benzie explained, however, that the agreement did not protect him from prosecution for all charges stemming from his role in the murder and that he was currently being prosecuted on related charges. On redirect examination, Benzie also explained that he had risked his personal safety by testifying against Hughes, and described an incident in which two men attacked him with knives in jail because he was a "snitch."

Sullivan testified about the plea agreement he made with the Commonwealth in exchange for his testimony against Hughes. Under the terms of that agreement, Sullivan agreed to plead guilty to second-degree murder for his role in Plaster's death in exchange for a sentence within the range recommended by his sentencing guidelines. Like Benzie, Sullivan testified that he risked his safety by testifying against Hughes. He testified that he knew that Hughes was a "felon" and a "criminal" and that Hughes had told him about an incident where he had beaten a man with a hammer when he refused to sell drugs to him. He also testified that Hughes had told him that he had been in several bar fights.

Additionally, Sullivan testified that he was afraid of Hughes because of "the kinds of people he [ran] around with." Sullivan testified that Hughes was currently a member of the Warlocks motorcycle club and that Hughes's membership in the club caused him concern. Sullivan testified that he feared for his personal safety while he was in prison, as well as the safety of his family. Due to his fear of Hughes, Sullivan testified that he wore a hood to conceal his identity when he helped the police find Plaster's body.

Detective C.P. Cameron testified about his interactions with Benzie and Sullivan during the investigation of Plaster's murder. Cameron testified that when he initially interviewed Benzie about Hughes's involvement in the murder, Benzie told him that Hughes was involved with the Warlocks motorcycle club. Benzie told Cameron that he was afraid of the Warlocks and

that if he helped with the investigation he could be "a dead man." Cameron explained that "the nature of motorcycle gangs [is] not very friendly to law enforcement."

Cameron also testified that Sullivan was afraid of Hughes and that he asked for police protection for himself and his family rather than immunity from prosecution for his role in the murder. To facilitate Sullivan's request, Cameron testified that Sullivan wore a hood and large jacket to conceal his identity when he helped the police find Plaster's body and that a detective stayed at his house that evening to protect his family. Cameron testified that Sullivan told him that Hughes "at the time of his arrest was the president of one of the chapters of Virginia for the outlaw motorcycle gang the Warlocks." Cameron explained that Sullivan's fear was "natural" given the "other events involving Mr. Hughes in the past and the fact that he . . . was a member of an outlaw motorcycle gang."

Following the testimony of Benzie, Sullivan, Cameron, and others involved in the investigation of Plaster's murder, Detective Todd Nosal testified about the Warlocks motorcycle club. Hughes objected to his testimony, arguing that it was irrelevant evidence of prior bad acts that was highly prejudicial to his case. The Commonwealth responded to the objection by arguing that evidence about the motorcycle club was relevant to corroborate Benzie's and Sullivan's fear of Hughes and to explain certain items seized during the murder investigation. The circuit court overruled the objection, explaining that "the relevance would be that there was a lot gotten into in cross examination of the two major witnesses about their fear and what the basis for their fear was. And so to the extent they've got that evidence about this organization and the fact that the paraphernalia was found there, that's supporting of their fear."

After the circuit court overruled Hughes's objection, Nosal provided background information concerning the Warlocks motorcycle club. Nosal testified that the Warlocks had chapters throughout the nation and that they generally were "not cooperative with law

- 4 -

enforcement." Nosal then described several items of clothing and jewelry seized from Hughes's motorcycle shop and a vest seized from a truck owned by Hughes that was parked in Benzie's workshop. Nosal testified that these items displayed emblems associated with the Warlocks.

Nosal specifically testified that one of the rings found at Hughes's business displayed a "one percent" in its center and that the Warlocks were known as a "one percenter" motorcycle club.[3] Nosal explained that the term "one percenter" originated following a riot at a motorcycle rally in 1947. After the rally, the American Motorcycle Association issued a press release stating that "ninety-nine percent of the motorcycle riders in America were law-abiding citizens, [but] one percent did not subscribe to the rule and were considered outlaw by the American Motorcycle Association." Nosal explained that certain motorcycle clubs on "the fringes of normal society" quickly adopted the term and began wearing "one percenter" emblems on their clothing. While Nosal testified that the Warlocks were known as "one percenters," he clarified that it was not illegal to be a member of the Warlocks and that some members of "one percenter" groups were law-abiding citizens.

After the Commonwealth rested its case, Hughes testified on his own behalf and denied that he had any role in Plaster's murder. On cross-examination, he admitted that he was the president of a local chapter of the Warlocks motorcycle club and that he owned the items related to the Warlocks that were seized by the police. Hughes also admitted that the club was a "one percenter" group and specifically agreed with Nosal's testimony regarding the origins of that term. Hughes explained, however, that he was not a member of the Warlocks in 2007 when Plaster disappeared. When asked about the activities of the Warlocks, Hughes stated that they

---

[3] Nosal also testified that the Hell's Angels motorcycle club was a "one percenter" group.

were "a bunch of guys who liked to ride motorcycles," who held annual events to support their club.

At the conclusion of Hughes's trial, the jury convicted him of first-degree murder and sentenced him to twenty-seven years of incarceration.[4]  The circuit court imposed the jury's sentence, and this appeal followed.

## II.  ANALYSIS

On appeal, Hughes contends that Nosal's testimony about the Warlocks was irrelevant and highly prejudicial.[5]  As the Commonwealth failed to contend that Plaster's murder was related to the Warlocks in any way, Hughes argues that evidence concerning the Warlocks was not relevant to prove any element of the charged offense.  Furthermore, Hughes maintains that evidence of his membership in the Warlocks was not factually relevant because he had not yet joined the club when Plaster disappeared in 2007.  Additionally, Hughes contends that Nosal's testimony portraying the Warlocks as an "outlaw" or "one percenter" organization inflamed the jury and unfairly allowed them to infer that he was a criminal.

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion."  Jones v. Commonwealth, 38 Va. App. 231, 236, 563 S.E.2d 364, 366 (2002).  In the present case, however, we do reach the merits of Hughes's argument.  Assuming without deciding that the

---

[4] The jury found Hughes not guilty of using a firearm to commit the murder in violation of Code § 18.2-53.1.

[5] Hughes's sole assignment of error on appeal is expressly limited to the relevance of Detective Nosal's testimony.  At trial, Hughes objected to testimony from other witnesses about his membership in the Warlocks because it constituted inadmissible hearsay or speculation.  On appeal, however, he has failed to challenge the circuit court's decisions to admit that testimony. Accordingly, we are barred from considering the admissibility of the testimony of other witnesses concerning the Warlocks and only consider the admissibility of Nosal's testimony on the grounds presented in Hughes's assignment of error.  See Rule 5A:20.

circuit court erred by admitting Nosal's testimony concerning the Warlocks, we conclude that any error resulting from the admission of his testimony was harmless under the particular circumstances of this case.

As the error alleged in the present case involves the circuit court's decision regarding the relevance of certain evidence, we apply the statutory standard provided by Code § 8.01-678 to determine whether the non-constitutional error was harmless. Code § 8.01-678 states, in pertinent part, that "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed." Interpreting this standard, the Supreme Court has reasoned that:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand.

Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)). Stated alternatively,

> An error is harmless . . . if "other evidence of guilt is so overwhelming and the error so insignificant by comparison that the error could not have affected the verdict," or, "*even if the evidence of the defendant's guilt is not overwhelming, . . . if the evidence admitted in error was merely cumulative of other, undisputed evidence*."

McClean v. Commonwealth, 32 Va. App. 200, 211, 527 S.E.2d 443, 448 (2000) (emphasis added) (quoting Ferguson v. Commonwealth, 16 Va. App. 9, 12, 427 S.E.2d 442, 444-45 (1993)).

We conclude that Nosal's testimony about the Warlocks was cumulative of other evidence before the jury. Both Sullivan and Cameron testified that Hughes was a member of the Warlocks before Nosal even testified. Sullivan testified that Hughes was a member of the Warlocks and that his association with that club caused Sullivan to fear for his personal safety. Cameron testified that Benzie told him that Hughes was a member of the Warlocks and that Benzie implied that he would jeopardize his safety by assisting the police in the murder investigation. He also testified that Sullivan made similar statements. Additionally, Cameron testified that Sullivan told him that the Warlocks were an "outlaw motorcycle gang" and that in his experience, motorcycle gangs were not friendly to law enforcement.

Furthermore, Hughes personally corroborated Nosal's testimony. He admitted that he was a Warlock and that the Warlocks motorcycle club was a "one percenter" gang. He also expressly agreed with Nosal's testimony concerning the origin of the "one percenter" term and referred back to the detective's testimony while he was testifying. Hughes then provided additional testimony about the activities of the club.

Although Nosal's testimony described the Warlocks motorcycle club in greater detail, the substance of his testimony reached the jury through other witnesses. Before Nosal testified, Sullivan and Cameron established that Hughes was a member of the Warlocks, an "outlaw" motorcycle club that did not cooperate with law enforcement, and Hughes verified Nosal's testimony later in the trial. Accordingly, we conclude that Nosal's testimony was cumulative and its admission, at most, constituted harmless error.

Other aspects of this case, however, also support our conclusion. When analyzing whether an error is harmless, we consider a host of factors, including the overall strength of the Commonwealth's case. See, e.g., Sargent v. Commonwealth, 5 Va. App. 143, 154, 360 S.E.2d 895, 901 (1987). In the present case, the Commonwealth presented substantial evidence at trial

establishing Hughes's guilt of the charged offense. Benzie and Sullivan both provided eyewitness testimony about the murder. A third witness, Benzie's brother-in-law, also testified that he saw Hughes, Benzie, Sullivan, and Plaster on Benzie's property together sometime in 2007 and that he observed a bag of lime in Hughes's truck on that occasion. This witness testified that Benzie told him not to accompany the men into the woods that day. He also testified that he recovered a derringer pistol that had been buried on the property using a metal detector at Hughes's and Benzie's request.

Additionally, physical evidence corroborated several aspects of Benzie's and Sullivan's testimony. Consistent with Benzie's testimony, Plaster's car was found in a high-crime area with the keys in its ignition shortly after his disappearance. Consistent with the testimony of both witnesses, a .9 mm bullet was found in Plaster's skull and his ribs had been damaged by another gunshot. Furthermore, lime was found in the soil around his body. Hughes's cell phone records also provided independent evidence linking him to the crime. Although he frequently called Plaster before his disappearance, he abruptly stopped calling him after he had disappeared.

We also note that the prejudicial effect of Nosal's testimony was limited by the way it was framed by the Commonwealth. Although the Commonwealth asked Nosal whether the Warlocks were a "one percenter" club, Nosal clarified that membership in the Warlocks was not illegal in itself and that members of the Warlocks and other "one percent" groups could be law-abiding citizens. Thus, the Commonwealth limited the prejudicial effect of Nosal's testimony and lessened the possibility that the jury would infer that Hughes was a criminal solely because he was a member of the Warlocks. The prejudicial effect of Nosal's testimony was also limited by the fact that testimony describing Hughes's prior criminal acts was already in evidence. Sullivan explicitly testified that Hughes was a "felon" and "criminal," and described several instances where Hughes violently assaulted others.

### III.  CONCLUSION

In conclusion, we hold that the admission of Nosal's testimony constituted harmless error.  In light of the cumulative nature of the testimony, the circumstances limiting its prejudicial effect, and the strength of the Commonwealth's evidence, we conclude that its admission did not affect the jury's verdict.  Accordingly, we affirm Hughes's conviction.

<u>Affirmed.</u>