# Richmond

## CHARLES RUFUS AKERS V. COMMONWEALTH OF VIRGINIA.

June 13, 1975.

Record No. 741039.

Present, All the Justices.

R. O. Kellam (*E. Ralph Coon, Jr.; Coon & Kellam,* on brief), for plaintiff in error.

*James E. Kulp, Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

I'Anson, C.J., delivered the opinion of the court.

Charles Rufus Akers, defendant, was indicted for the murder of a fourteen-year-old girl. Defendant pleaded not guilty, waived trial by jury, was found guilty of murder in the first degree, and was sentenced to life imprisonment in the State penitentiary.

Defendant contends that the trial court erred in:

(1) Admitting into evidence his alleged confessions without first hearing evidence on the issue of voluntariness;

(2) Admitting the confession made to Officers Deane and Morgan after he had indicated to them that he did not want to answer any more questions;

(3) Permitting the Commonwealth's Attorney, on cross-examination, to exceed the scope of direct examination;

(4) Holding that his confessions were voluntary;

(5) Not requiring the Commonwealth to elect on which theory it was seeking a first degree murder conviction; and

(6) Holding that he was guilty of murder in the first degree.

The evidence shows that on October 20, 1973, the deceased and her family were in Prince William County to attend a wedding. At approximately 2:30 p.m. the deceased left her family to go to a nearby shopping center.

At 3:08 p.m. the County police received a telephone call from a person who identified himself as Akers. He gave his address, and stated that he had just killed someone.

Two officers were immediately dispatched to the scene, and upon their arrival were approached by the defendant who said, "I killed her. She is upstairs." Defendant was placed under arrest and advised of his *Miranda* rights, which he said he understood. One of the officers went upstairs in defendant's apartment but could not find the body. He returned and asked the defendant where she was. Defendant responded, "In the closet." The officer went back upstairs and found some blankets and clothing piled up in the closet, and upon moving them he saw the deceased. Her slacks were down to her knees. Defendant was again advised of his *Miranda* rights and he said that he understood them.

Investigator Deane, of the police department, arrived on the scene at approximately 3:15 p.m. Upon entering defendant's bedroom, he observed the girl's body in the closet. He found one knife with blood on it and another knife and a wet towel on the closet shelf. Spots of blood were on the rug and the wall of the room.

Shortly thereafter, Deane advised defendant of his *Miranda* rights and defendant made a statement which was reduced to writing by the officer and signed by defendant. The essence of the statement, marked exhibit 18, which was introduced into evidence over the objection of defendant, was that he saw the girl at the 7-11 store; that she asked to see his apartment, and he followed her up to his bedroom; that she sat on the bed and began unbuckling her pants; that he started to help her and she said, "What do you think I am, a whore?" and began screaming "rape" and "help"; and that he "stabbed her in the chest at least once, maybe more."

Prior to the introduction of the above statement into evidence, defendant requested a hearing on the issue of voluntariness, but the trial court ruled that defendant would be allowed an opportunity later to put on such evidence for the court to determine if it should consider the statement.

Approximately four hours after this statement was signed, Deane again advised defendant of his *Miranda* rights. After each right was read to the defendant, Deane asked him if he understood and defendant replied each time that he did. Defendant also signed the waiver of rights statement. He was questioned by Officers Deane and Morgan, and the interrogation was recorded on tape and later

transcribed. Statements found in the first portion of the recorded interrogation were substantially the same as those made by defendant to Deane earlier in the day. When defendant was asked how he got the girl to walk with him to his apartment, the following exchange occurred:

"Akers: Do I have to talk about it now?

"Deane: Well, we would just like to get it all straightened out now.

"Morgan: Tell it all right now. It'll do you good to get it all out.

"Deane: We know you are upset.

"Morgan: Don't you think you'd sleep better at night?

"Akers: No. I can sleep good anyhow.

"Deane: You will feel better when you tell the truth about it, Charles.

"Morgan: Tell us exactly what happened here at the 7-11."

Following this exchange, defendant continued to answer the officers' questions and did not indicate that he wanted to stop the interrogation. His answers indicated that he had threatened the girl with a knife and held her by the arm or around the waist as they proceeded to his apartment.

The transcribed statement, marked exhibit 22, was also introduced into evidence over the objection of defendant.

A medical examiner viewed the body while it was still in the closet. He stated that the girl's slacks were pulled down to the mid-buttock level and her underpants had been pulled down to expose pubic hair. The autopsy revealed that the girl had seven stab wounds in her chest and abdomen and that there were wounds on the palm of her left hand, and bruises on her nose, lip and neck. Vaginal smears were negative, indicating no evidence of rape.

Defendant's father testified that when he saw his son in jail on October 21, 1973, defendant appeared to be very nervous and upset.

Robert Caton, a deputy sheriff of the County and a friend of defendant's family, testified that he saw defendant, at defendant's request, on or about October 23, 1973. Caton said that at that time the defendant appeared to be relaxed and able to understand what was said to him, but when he took him to the Medical Health Center on October 31, 1973, pursuant to a court order, the defendant looked tense.

Defendant was examined by Dr. N. M. Alp, a psychiatrist, on October 31, 1973. At that time Dr. Alp found the defendant to be extremely depressed and confused. He diagnosed defendant's condition as schizophrenic, simple type, and prescribed certain medication. In February 1974, defendant was adjudged competent to stand trial. Dr. Alp testified that after he examined defendant on May 7, 1974, he was able to verify that defendant had a perfectly clear mind at the time the crime was committed, and in his report he concluded that defendant was not suffering from any kind of mental disorder at that time.

Defendant took the stand solely for the purpose of testifying concerning the voluntariness of his alleged confessions, exhibits 18 and 22. He admitted that he had been advised of his constitutional rights but said that he did not understand them. It was only after he had talked with an inmate in the jail that he fully understood his rights. Defendant was 21 years of age and had "gone up" to the eleventh grade in school.

Defendant contends that the trial court erred in admitting into evidence exhibits 18 and 22 before hearing evidence on the issue of voluntariness of the confessions.

Defendant relies on the rule in Virginia that in determining the admissibility of a confession, the trial judge must hear all evidence relating to the question of its voluntariness out of the presence of the *jury* and rule upon whether it was freely and voluntarily made. The credibility and weight of a confession are questions for determination by the *jury*. *Washington* v. *Commonwealth*, 214 Va. 737, 738-39, 204 S.E.2d 266, 267 (1974); *Reid* v. *Commonwealth*, 206 Va. 464, 467, 144 S.E.2d 310, 312 (1965).

Defendant also relies on *Jackson* v. *Denno*, 378 U.S. 368 (1964). There the Supreme Court held that the New York procedure for determining the voluntariness of confessions in criminal cases tried before a *judge and jury* violated the Fourteenth Amendment because it did not afford a defendant an opportunity "to have a fair hearing and a reliable determination on the issues of voluntariness, a determination uninfluenced by the truth or falsity of a confession." 378 U.S. at 377. The Court was concerned with a jury's inability to decide both the voluntariness of a confession and the guilt or innocence of an accused without allowing the consideration of one issue to influence the other.

Defendant argues that the Virginia rule and the holding in *Jackson* v. *Denno, supra,* relating to the issue of the voluntariness of a confession, are applicable in a nonjury trial of a criminal case. However, in all the cases relied upon there was a jury trial. Here the defendant was tried by the judge without a jury.

In *People* v. *Brown,* 24 N.Y.2d 168, 172, 247 N.E.2d 153, 155, 299 N.Y.S.2d 190, 193 (1969), the court held that "a Judge—unlike a jury—by reasons of his learning, experience and judicial discipline, is uniquely capable of distinguishing the issues and of making an objective determination as to voluntariness, regardless of whether he has heard evidence on other issues in the case," and that the rule laid down in *Jackson* v. *Denno,* requiring a separate hearing on the issue of voluntariness, has no applicability in a nonjury case. For a contrary view, *see United States ex rel. Spears* v. *Rundle,* 268 F.Supp. 691 (E.D.Pa. 1967), and *United States ex rel. Owens* v. *Cavell,* 254 F.Supp. 154 (M.D.Pa. 1966).

In the case at bar, the defendant's spontaneous statements that he had killed the girl and that her body was in the closet had already been admitted in evidence without objection when the trial judge was requested to hear evidence on the voluntariness of exhibits 18 and 22. Thus we cannot say that it was reversible error for the court trying the case without a jury to delay passing on the issue of voluntariness of those confessions until after he had heard defendant's testimony on the issue.

Even though we hold that the action of the trial court in not first hearing evidence on the issue of voluntariness of the written confessions before admitting them into evidence was not reversible error under the peculiar facts and circumstances of this case, we are constrained to say that it would be better procedure in a nonjury trial of a criminal case for the trial judge to determine the voluntariness of a confession before admitting it into evidence.

■ Defendant contends, in addition to his first contention, that it was error to admit into evidence exhibit 22 because he stated during his interrogation by the officers that he did not want to answer any more questions. We do not agree.

Defendant argues that his answers following his question, "Do I have to talk about it now?" were inadmissible under the doctrine established in *Miranda* v. *Arizona,* 384 U.S. 436 (1966), that "[i]f the individual indicates in any manner, or at any time prior to or during

questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473-74.

The waiver of rights statement signed by the defendant clearly stated that if he did not want to answer questions he had the right to stop the interrogation at any time. He had also been advised on three prior occasions within a period of five hours that he could stop answering the officers' questions at any time. We do not construe defendant's response to mean that he did not want to answer any more questions. Defendant's inquiry was no more than an impatient gesture on his part. If defendant had desired to end the interrogation, he could have simply said, "I do not want to answer any more questions." *See State* v. *Nichols*, 212 Kan. 814, 512 P.2d 329, 332 (1973). There was nothing coercive or deceitful in the manner in which the officers conducted the interrogation which caused defendant to continue answering their questions. *See Land* v. *Commonwealth*, 211 Va. 223, 229, 176 S.E.2d 586, 590 (1970).

■ Defendant complains that when he took the stand to give evidence limited to the voluntariness of his confession, the Commonwealth exceeded the scope of proper cross-examination. We do not agree.

The latitude permissible in cross-examination of a witness is left largely to the sound discretion of the trial court. *Robinson* v. *Commonwealth*, 165 Va. 876, 881, 183 S.E. 254, 257 (1936).

The cross-examination of the defendant here related to statements made by him on direct examination. The defendant testified that he did not remember making certain statements to the officers, and that assertion gave the Commonwealth's Attorney the right to ask questions testing defendant's memory and credibility. Thus the trial court did not abuse its discretion.

■ Defendant says that he was incapable of making a knowing and intelligent waiver of his Fifth Amendment rights because he was psychotic; that he was nervous when questioned by the police; and that he had an I.Q. of only 77.

The validity *vel non* of the waiver is relevant to a determination of the voluntariness of the confessions. The burden was on the Commonwealth to show by a preponderance of the evidence that defendant's confessions were voluntary. Factual findings by the trial court, when supported by credible evidence, are given the same weight as findings of fact by a jury and will not be disturbed by us on appeal. *Witt* v. *Commonwealth*, 215 Va. 670, 674, 212 S.E.2d

293, 296-98 (1975); *Campbell* v. *Commonwealth*, 194 Va. 825, 830, 75 S.E.2d 468, 471 (1953).

The spontaneous statements made by the defendant to the first two police officers who arrived on the scene indicate that he was thinking clearly. While Dr. Alp stated that defendant was psychotic when he examined him ten days after the commission of the offense, he also said that defendant had no mental disorder on the day of the crime.

Defendant's nervousness when talking to the police did not render his confession involuntary. Nor did his claim that he had an I.Q. of only 77 make his confessions inadmissible. Intelligence and education are merely two elements in determining voluntariness. Defendant had a tenth grade education, and his testimony at the trial and his statements to the officers did not show any lack of intelligence. *See Johnson* v. *Commonwealth*, 184 Va. 466, 473-74, 35 S.E.2d 770, 772 (1945). *See also Lunnerman* v. *Peyton*, 310 F.Supp. 323, 325 (W.D.Va. 1970).

Moreover, defendant testified that when he made the statements to the officers he was not under the influence of drugs or alcohol; that he had not been threatened or offered any promises of reward or leniency; and that he never indicated to the officers in any way that he did not understand his rights.

We hold that the evidence supports the trial judge's factual findings that the confessions were voluntary.

Defendant's argument that the court erred in not requiring the Commonwealth to elect whether it would proceed against the defendant on the theory of willful, deliberate and premeditated murder or on the theory that the killing was committed in the commission of abduction, because the two offenses are inconsistent and mutually exclusive, is without merit.

Code § 18.1-21, as amended, in pertinent part, defines murder in the first degree as a "wilful," deliberate and premeditated killing, or a killing in the commission of, or in an attempt to commit certain designated felonies, including abduction for immoral purposes.

Under an indictment for murder in the form prescribed by Code § 19.1-166 or Rule 3A:F5, the Commonwealth may prove a killing in any manner or in different manners. Thus the Commonwealth was not required to elect whether it was proceeding against the defendant on the theory that the killing was willful, deliberate and premeditated or under the felony-murder doctrine that the killing

occurred in the commission of abduction. Nor do we perceive that the theories are inconsistent and mutually exclusive.

There is ample evidence in the record to support the trial judge's finding that defendant was guilty of a willful, deliberate and pre-meditated murder, constituting murder in the first degree.

■ To constitute willful, deliberate and premeditated murder it is not necessary that the intent to kill exist for any particular length of time prior to the killing. The intent to kill may spring into existence for the first time at the time of the killing, or at any time previously. *Barber* v. *Commonwealth*, 206 Va. 241, 253, 142 S.E.2d 484, 493 (1965). It is the will and purpose to kill, not necessarily the interval of time, which determine the grade of the offense. *Fuller* v. *Commonwealth*, 201 Va. 724, 730, 113 S.E.2d 667, 672 (1960).

Here the evidence shows that defendant stabbed the deceased when she began to scream and yell "rape," and the intent to kill came into existence at that time.

The evidence also supports the finding that the killing occurred during the commission of abduction for immoral purposes, since the defendant threatened the deceased with a knife and forced her to go to his apartment.

For the reasons stated, the judgment of conviction is

*Affirmed.*