COURT OF APPEALS OF VIRGINIA

**UNPUBLISHED**

Present:   Judges Malveaux, Chaney and White
Argued at Lexington, Virginia


MICHAEL WADE STOUT

MEMORANDUM OPINION[*] BY
v.       Record No. 0738-24-3          JUDGE KIMBERLEY SLAYTON WHITE
AUGUST 5, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
John T. Cook, Judge

(Pamela W. Willoughby; The Law Office of Pamela Witt
Willoughby, Esq., PLLC, on brief), for appellant.  Appellant
submitting on brief.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Michael Stout was charged with both malicious wounding and murder noncapital first

degree.  Before his trial, Stout filed a motion to suppress and a motion for appointment and

compensation of expert.  The trial court denied both motions.  Stout was tried and convicted by

jury of murder in the second degree and subsequently sentenced by the court to 40 years, with 10

years suspended.[1]

Stout appeals the trial court's denials of both the motion to suppress and the motion for

appointment and compensation of expert.  He argues that his Fifth Amendment right to remain

silent was violated.  Thus, he maintains that any statements made during the police interrogation

should have been suppressed.  Additionally, Stout argues that the trial court erred in denying his

---

[*] Pursuant to Code § 17.1-413(A), this opinion is not designated for publication.

[1] Prior to trial and without objection by Stout, the trial court granted the
Commonwealth's request to nolle prosequi the malicious wounding charge.

motion for the appointment and compensation of expert asserting that an expert was necessary to decipher what the victim told 911 operators on the recorded calls provided to him. We disagree and affirm the decision of the trial court.

BACKGROUND[2]

Matthew McGann lived with his custodial grandfather, Gregory McGann, and his two half-brothers, Leland Dixon and Caleb McGann. The four lived in a single-wide trailer on Wards Road in Campbell County. Caleb's father was Eric McGann. Eric's half-brother was the appellant, Stout. According to Matthew, Gregory called Stout by his first name or "my son," while he referred to Matthew, Leland, and Caleb only by their first names. Gregory also called Eric his "son." Matthew not only knew Stout because of his connection to his family but also because Matthew's mother had previously been married to Stout's brother, and Stout "came over a bit."

On the morning of January 16, 2022, Matthew was asleep in his bedroom when his brother Leland woke him up. Matthew heard Gregory "yell for help but it sounded like it was a gargling noise after the help." Matthew immediately came out of his room to see what happened. Although he was not wearing his glasses and was almost "legally blind," Matthew testified that he saw Stout "standing over top" of Gregory. He further testified that he charged toward Stout to get him off of Gregory. Matthew tried to push Stout to the bathroom to hold him there, while Gregory "plead[ed] for his life" and held his neck. Blood from Gregory's neck was turning his hand red. Matthew observed blood on a table and a pool of blood where Gregory lay.

---

[2] According to familiar principles of appellate review, we will state the facts "in the light most favorable to the Commonwealth, the prevailing party at trial." *Meade v. Commonwealth*, 74 Va. App. 796, 802 (2022) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In addition, "we regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Id.* (quoting *Gerald*, 295 Va. at 473).

Matthew wrapped a towel around Gregory's neck to try to slow the bleeding while Gregory called the police. He told the 911 operator that his son had cut him with a knife. Matthew took the phone from Gregory and spoke with the 911 operator. The 911 operator told him to look for a weapon, and Matthew found a knife in the kitchen sink with a crimson red substance on it. He also noticed that there was an iron smell in the trailer.

Shortly thereafter, Deputy Samantha Earhart and her entire shift responded to the McGann residence. Deputy Earhart entered the residence through the front door of the trailer and saw Gregory lying on the kitchen floor in what appeared to be a puddle of blood. Deputy Earhart ordered Matthew to exit the residence and began to provide aid to Gregory.

Gregory took two or three breaths before his whole body went limp. Deputy Earhart began CPR compressions before realizing Gregory had a "very open, very deep wound" from one side of his neck to the other. Emergency medical services arrived approximately five minutes later.

Gregory tried to speak, but Deputy Earhart testified that it was "more like a gurgling." She also observed a steak knife with a red substance on the blade in the kitchen sink. Dr. Renee Robinson, a forensic pathologist with the Office of the Chief Medical Examiner, testified that Gregory died from a "sharp force injury of the neck."

Lieutenant Michael Rossi also responded to the home. While inside, he encountered another male—later identified as Stout—in a hallway that led to bedrooms and a bathroom. Stout appeared "detached and stoic," especially compared to Matthew. When Rossi addressed Stout, he did not comply with his commands to come out of the hallway. Instead of coming toward Rossi, Stout "turned around and started towards . . . the back door of the residence" or to one of the three rooms in that part of the trailer. After Rossi yelled his commands and held Stout

at gunpoint, Stout complied. Rossi opened the back door and told Deputy Hamlette Burke to take Stout into custody.

Investigator Jake Wade collected evidence from the McGann residence and from Stout. Investigator Wade took photographs and collected samples from Stout's clothes, which appeared to be blood-stained. Investigator Wade testified that Stout appeared to have blood staining on his shoes, pants, shirt, and on his hands. The investigator swabbed both of Stout's hands for "possible evidence or transfer of bodily fluids from the victim to the suspect."

Investigator Wade testified that there "appear[ed] to be some blood spatter" on Stout's pants leg. He explained that spatter "indicate[d] that there actually was some transfer of blood hitting the surface and then going directly to another surface." The investigator did not observe any injuries to Stout.

Lisa Schiemeier-Wood, a forensic scientist with the Virginia Department of Forensic Science, conducted DNA analysis of the items collected from the McGann residence and from Stout. McGann could not be eliminated as a contributor to the DNA mixture profile developed from the swab of Stout's left hand.

Kristin Schaad, a forensic scientist in the biology section of the Virginia Department of Forensic Science, testified that she found blood on the blade of the knife recovered from McGann's residence. The certificate of analysis also confirmed that blood was found from the swabs on Stout's hands and pants. Schaad "developed a DNA profile" from Stout's pants, and Gregory could not be eliminated as a contributor of that DNA profile.

### The Interrogation and the Motion to Suppress

Captain Tracey Emerson interviewed Stout for less than an hour after he was arrested. Emerson read Stout his *Miranda*[3] rights 49 seconds into the interview. Emerson asked Stout if

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

he understood his rights, but he did not respond. Emerson asked Stout, "so you wanna tell me what happened today?" Emerson continued to question Stout, "can you tell me what happened?" At times, Stout sat mute, staring downward; sometimes he slightly shook his head; he also gestured with his hands; at other times he quietly mumbled some responses; he asserted that he was being confused with someone else; he claimed not to have any idea what had happened to Gregory; and he offered an explanation for the blood on his shoes. Stout later told Emerson, "I ain't got nothing to say." Emerson continued to question Stout, asking, "you ain't going to try to explain this?" Stout did not answer. Emerson continued questioning him while Stout maintained that he knew nothing. Stout then told Emerson to "take [him] to jail," to which Emerson responded, "you don't want to talk to me and try to do nothing to fix this thing, at least tell your part?" Stout responded, "Nah."

Emerson left the room and returned about seven minutes later. An investigator also entered the room and took photographs of Stout's hands and clothing and took swabs from his hands. Emerson again asked Stout to tell him what had happened but reiterated that Stout did not have to tell them anything. Stout then began responding with vague incriminating statements. Stout, without giving details, alleged that Gregory had molested children. At first, he maintained that he did not know what had happened, later offering various explanations, including that Gregory had slipped.

Stout finally disclosed that he was angry, alluding to what had happened to him as a child. Stout said, "I don't know what is happening in my head" and later stated that he was "called to do it" by "I guess God." Emerson asked Stout if he grabbed Gregory by the head and reached around to cut him, to which Stout responded, "pretty much."

Emerson testified that often he could not hear what Stout said because he "mumbled something[.]" He also testified that Stout never told him that he wanted to end the interview.

Emerson testified that Stout was "very vague" and "very quiet" but that he "wasn't denying everything or denying what had happened. He was acting at the beginning like he didn't know why he was even there. And toward the end of the interview, obviously that change[d], he gave more details." Stout did not ask for an attorney.

Stout argued that, during the interrogation, he said he "ain't got nothing to say."[4] Stout argued that he unambiguously invoked his right to remain silent "by staying silent" after being read the *Miranda* warning. Stout also asserted that when Emerson asked him "don't you want to do anything to fix this or at least tell your part," he said, "no." Stout argued that he "remained silent primarily responding very little to questions asked of him. His responses [were] generally I don't know, I don't know nothing, I don't know what you're talking about, I don't know why I'm here, just take me [to] jail, I ain't got nothing to say[.]"

The Commonwealth argued that Stout gave "very ambiguous" answers and that "none of them clearly say I don't want to talk to you anymore[.]" The Commonwealth also contended that Stout "waived [his right to remain silent] when he continued to sp[eak] and by his conduct." The Commonwealth acknowledged that Stout "did nothing to re-initiate contact," but argued that "just staying silent doesn't invoke the right to remain silent."

Stout agreed that the only issue was "whether there's an unambiguous waiver based on his statements." The trial court observed that it was "not like Mr. Stout says a whole lot in the whole thing anyway." The defense responded, "right." After taking the motion to suppress

---

[4] Although Stout testified that he made this statement seven seconds into the recording, Emerson was not asked about it and did not testify about such a statement at the suppression hearing or trial. It is difficult to discern what Stout said from listening to the recording itself and when the trial court denied the motion to suppress, the court did not reference any statement at the seven-second mark. Instead, the trial court found that there were "two points" in the interview at issue cited by the defense: one at approximately the seven-minute mark of the interview and the second at approximately the 29-minute mark.

under advisement, the trial court later concluded that the "sole issue" was "whether Stout asserted his right to remain silent after hearing *Miranda*[.]"

The trial court reviewed Stout's interviews and found that there were "two points that were really cited in the interview" by Stout. The first occurred at approximately seven minutes into the interview and "there's a question do you want to talk and [Stout] kind of mumbles something" that was "very difficult to understand[.]" The trial court found that Stout said, "something like nah or something like that very lightly and then, Captain Emerson leaves the room and comes back and they continu[e] questioning him."

The second occurred at approximately 29 minutes when Stout "says something at some point I don't got nothing to say" and that law enforcement continued questioning him. The trial court found that Stout "just kind of mumbles things and answers things" and that he did not unambiguously assert his right to remain silent. As a result, the trial court denied Stout's motion to suppress.

### *The 911 Call and the Motion for Appointment of an Expert*

Prior to trial, the Commonwealth presented to Stout two 911 calls made by Gregory and indicated an intention to introduce them at trial. Gregory made statements on the audio that are very difficult for the ordinary listener to understand. When Gregory was explaining to the operator what happened, he says "my son . . (-------) . . . . . . ." and he either spells or says the name of his assailant.

Stout contended that he needed the assistance of an expert who "may be able to examine and enhance, etc. in order to understand the word or spelling as relayed by the victim to the 911 operator as well as other voices on the audio recording." Stout contacted Doug Lacey of BEK TEK LLC located in Stafford, Virginia. Stout asserted that Mr. Lacey, an expert in the field of Forensic Audio/Video/Image recording, had agreed to assist Stout in this matter. Stout explained

that he was indigent and financially unable to pay for an expert to assist and moved for the court to appoint and compensate Mr. Lacey as an expert.

At the hearing on the motion, Stout reiterated that he "hop[ed] that the expert can hopefully listen to this and tell us what name or what spelling Mr. McGann" provided to the 911 operator. Stout acknowledged that Gregory said "son" during the 911 call, but that Stout "would like an expert to listen to this tape to hear the name of whoever the son he is referring to" and claimed that Gregory had "another son outside of the household[.]" Stout acknowledged that he had "no clue" what Gregory said on the 911 call and that "he could be saying a name of who he's saying did this or he could be saying [Stout's] name." When the trial court asked whether Stout had "any other evidence that's [going to] show some other party," he conceded that he did not at that point.

During argument, Stout argued he had made a particularized showing in establishing that the service of an expert was needed. The court stated that, "mere hope or suspicion - - is not enough."

The trial court denied Stout's motion for an expert, finding that there was "nothing to indicate to [the court] that this is just a guess or a suspicion or a hope from the Defendant that's there's some particularized need."

ANALYSIS

*I. The trial court did not err by denying Stout's motion to suppress.*

When the trial court denies a motion to suppress, the "appellant bears the burden of establishing that reversible error occurred." *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 474 (2020)). When considering whether to affirm the denial of a suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial." *Tirado v.*

- 8 -

*Commonwealth*, 296 Va. 15, 24 (2018) (quoting *Commonwealth v. White*, 293 Va. 411, 414 (2017)).

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, the prosecution may not "us[e] statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Keepers v. Commonwealth*, 72 Va. App. 17, 34 (2020) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). For example, the police must advise a suspect in their custody that he possesses certain rights, such as the right to remain silent. *Miranda*, 384 U.S. at 479. The Commonwealth bears the burden of proving that the suspect waived those rights "knowingly, intelligently, and voluntarily." *Knox v. Commonwealth*, 52 Va. App. 366, 372 (2008) (quoting *Green v. Commonwealth*, 27 Va. App. 646, 652 (1998)).

A suspect may invoke his right to remain silent "at any point prior to or during questioning." *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020) (citing *Edwards v. Commonwealth*, 451 U.S. 477, 482 (1981)). But he must do so "unambiguously." *Id.* (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). "*Miranda* should not be read too strictly as to require the police to accept as conclusive any statement, no matter how ambiguous, as a sign that the suspect desires to cut off questioning." *Midkiff v. Commonwealth*, 250 Va. 262, 267 (1995) (quoting *Lamb v. Commonwealth*, 217 Va. 307, 312 (1976)). "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Berghuis*, 560 U.S. at 382 (quoting *Davis v. United States*, 512 U.S. 452, 461 (1994)). Thus, the suspect must indicate his desire to exercise his right "sufficiently clearly that a reasonable police officer in the circumstances would understand the

statement" to invoke that right. *Davis*, 512 U.S. at 459. We review de novo whether a suspect's statement unambiguously invoked the right to silence while "consider[ing] the substance of the statement as well as the context in which it was made." *Thomas*, 72 Va. App. at 574. What the suspect said is a factual question we review for clear error. *Id.* at 573-74.

Stout identifies three statements that he contends invoked his right to silence and required the police to cease questioning: (1) his statement that he had "nothing to say"; (2) his request to Emerson to "take [him] to jail"; and (3) his response of "nah" when Emerson asked him if he wanted to talk, try to fix his situation, and tell his side of the story. None of those statements unambiguously invoked Stout's right to silence.

Our Court has repeatedly held that a suspect does not invoke his right to remain silent by telling the interrogating officer that he has "nothing to say" or the equivalent. For example, a suspect's "statement that he 'didn't have anything more to say' about the murder . . . was not a clear and unambiguous invocation of his right to silence." *Green*, 27 Va. App. at 654. Similarly, the statement, "I ain't got shit to say to y'all" is not an unambiguous invocation. *Mitchell v. Commonwealth*, 30 Va. App. 520, 527 (1999). In *Akers v. Commonwealth*, 216 Va. 40 (1975), the Supreme Court of Virginia held that the statement, "Do I have to talk about it now?" was not an invocation of the defendant's right to silence. *Id.* at 45-46. Similarly, in *Burket v. Commonwealth*, 248 Va. 596 (1994), our Supreme Court also held that the statement, "I just don't think I should say anything," was not an invocation of the right to silence. *Id.* at 609-10.

Given Stout's statements that the police had him confused with someone else and that he did not know what had happened and his denial of being at the crime scene, his statement that he had "nothing to say" could be reasonably interpreted to mean that he had already stated everything that he knew about the subject and not that he wished to invoke his constitutional

- 10 -

rights.[5] Thus, Emerson did not violate *Miranda* by continuing to question Stout after this statement.

Similarly, Stout did not unambiguously assert his right to silence by telling Emerson to take him to jail. The statement did not expressly address Stout's desire to remain silent and left open the possibility that he would still be willing to talk to the police, perhaps on the way to jail or at the jail itself. Indeed, we recently held that a defendant did not invoke his right to remain silent by telling detectives, "I don't have anything else to say, man. If y'all wanna take me to jail[.] I don't have anything else to say, man." *Johnson v. Commonwealth*, No. 1295-22-1, slip op. at 5, 14 (Va. Ct. App. Mar. 12, 2024).[6] We find *Johnson* instructive, and conclude that the facts of this case warrant the same result.

Finally, we are unpersuaded by Stout's argument that he invoked his right to silence by answering "something like nah or something like that very lightly" when Emerson asked if he wanted to talk, try to fix his situation, and tell his side. In determining whether a statement is a clear invocation of the right to silence, the court may consider the "tone of [the suspect's] voice, his voice inflections, and his demeanor." *Commonwealth v. Redmond*, 264 Va. 321, 330 (2002). Here, the trial court found that it was "very difficult to understand" what Stout said because he "just kind of mumble[d] things." Emerson also testified at the suppression hearing that he had a difficult time understanding Stout and initially believed that Stout had answered, "I don't know." Other courts have found a failure to invoke in similar circumstances. *See Bailey v. State*, 31 So. 3d 809, 815-16 (Fla. Dist. Ct. App. 2009) (holding that the statement "Man, I don't really

---

[5] Those statements came after Stout appeared to state that he had "nothing to say" near the beginning of the interview, but before his later assertion that he had nothing to say. The trial court did not address Stout's earlier statement and only focused on the latter one. Regardless, however, neither statement was an unambiguous invocation in light of *Green* and *Mitchell*.

[6] Although not binding, unpublished opinions can be used as persuasive authority. Rule 5A:1(f).

want to talk about that" was not a clear invocation because the suspect "essentially mumbled the words in question and followed them with additional, indecipherable language"); *State v. Newell*, 132 P.3d 833, 842 (Ariz. 2006) (en banc) (holding that "a barely audible, mumbled statement made while [the suspect] and the detective were both talking . . . was not a sufficiently clear invocation of the right to counsel").

Even if Stout's statement had been audibly clear, he was responding to a compound question. Merely answering yes or no to a compound question is ambiguous because it is unclear whether the answer concerns one or multiple parts of the question. Although the different parts of Emerson's questions were similar, willingness to talk and wanting to help one's situation are not identical. Stout's mumbled response to Emerson's compound question did not unambiguously invoke his right to silence.

We note that when evaluating an alleged invocation, not only do we look to the words uttered, but we must also evaluate those words in the context in which they were made. Here for the approximately one-hour long interview, Stout continued to engage with the investigator through his gestures, mumbles, denials, and explanations. Even after being reminded that he did not have to tell his side of the story, Stout continued to communicate with the investigators. The trial court did not err in denying Stout's suppression motion.

> II. *The trial court did not err by denying Stout's motion for appointment and compensation of an expert.*

An indigent defendant seeking to have an expert appointed at the Commonwealth's expense must show a particularized need for the expert's services and that he will be prejudiced by the lack of expert assistance. *Lenz v. Commonwealth*, 261 Va. 451, 461 (2001); *accord Husske v. Commonwealth*, 252 Va. 203, 213 (1996). Whether an indigent criminal defendant "has made the requisite showing of a particularized need lies within the discretion of the circuit court." *Lenz*, 261 Va. at 461. Thus, we review the trial court's denial of the motion for an abuse of discretion. *See*

*Green v. Commonwealth*, 266 Va. 81, 91-92 (2003); *see also Lenz*, 261 Va. at 461-62 (stating that "[a]n indigent defendant's constitutional right to the appointment of an expert, at the Commonwealth's expense, is not absolute," that the defendant "must demonstrate that the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance" (citations omitted)).

When reviewing a trial court's decision for an abuse of discretion, we will not reverse the trial court's judgment unless "reasonable jurists could not differ" that an expert should have been appointed. *McDaniel v. Commonwealth*, 73 Va. App. 299, 308 (2021) (quoting *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016)). However, an "error of law by the trial court is *ipso facto* an abuse of its discretion." *Fitzgerald v. Commonwealth*, 61 Va. App. 279, 284 (2012) (quoting *Bynum v. Commonwealth*, 57 Va. App. 487, 490 (2011)).

Following his attack, Gregory told the 911 operator that his "son" had cut his throat with a knife. Matthew testified that, at the time Gregory was murdered, he lived in the single-wide trailer with Gregory and his two half brothers Caleb and Leland. Matthew testified before the court that Gregory referred to Stout as his son, but only referred to Matthew, Caleb, and Leland by their names. Gregory then either spelled or said the name of the "son" he was referring to. This portion of the 911 recording is unintelligible. Stout, in an effort to decipher the recording, contacted Doug Lacey of BEK TEK LLC, an expert in forensic audio/video/image recordings for his assistance.

With this testimony, Stout argued that a forensic audio expert was needed to decipher what Gregory said. Stout stated, "[d]id [Gregory] spell the name of the person [who slit his throat]. Did he say the name of that person. We don't know whether he's saying Michael, Matthew, Eric." Here, Stout conceded that he had "no clue" as to what Gregory said on the 911 call. He even acknowledged that Gregory may have said Stout's name.

- 13 -

"A particularized need is more than a '[m]ere hope' that favorable evidence can be obtained through the services of an expert." *Green*, 266 Va. at 92 (quoting *Husske*, 252 Va. at 212). To adequately demonstrate a particularized need for expert assistance, the defendant must have a specific and actual idea of what favorable evidence will be revealed through the expert's assistance. *Johnson v. Commonwealth*, 292 Va. 772, 778-79 (2016). A particularized need amounts to a "demontrat[ion] that the services of an expert would materially assist [the defendant] in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." *Id.* at 778.

Ultimately, Stout was relying on a mere hope that favorable evidence would be revealed through the requested expert assistance. *See Barksdale v. Commonwealth*, 31 Va. App. 205, 211 (1999); *see also Commonwealth v. Sanchez*, 268 Va. 161, 166 (2004) ("[C]onclusory assertions" that expert testimony regarding scientific testing may show the presence of errors that "'*could have had a* significant impact'" were not "'particularized' because they indicate[d] nothing more than [the defendant's] 'hope or suspicion.'").

Accordingly, the trial court did not abuse its discretion when it denied Stout's motion for the appointment and compensation of an expert witness. Stout failed to demonstrate the requisite particularized need for expert assistance.

CONCLUSION

For the foregoing reasons, we find no error in the court's denial of the motion to suppress and the motion for appointment and compensation of an expert. Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*

Chaney, J., concurring in part, and dissenting in part.

When Stout told Officer Emerson, "I ain't got nothing to say," he clearly and unambiguously invoked his right to remain silent. The trial court erred in finding otherwise. Therefore, I respectfully dissent from the majority's opinion that Stout did not invoke his right to remain silent by telling Emerson, "I ain't got nothing to say." However, since the evidence was clear beyond a reasonable doubt to convict Stout without the statements made after the 29-minute mark, the error by the trial court was harmless. Thus, I concur with the majority's opinion affirming the conviction.

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "Whether a statement sufficiently invokes or waives the right to silence is a legal question we review *de novo*." *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020). This includes "a de novo review of the legal issue whether [his] words, taken in context, were sufficient to invoke his right to counsel." *Stevens v. Commonwealth*, 283 Va. 296, 302 (2012) (alteration in original) (quoting *Zektaw v. Commonwealth*, 278 Va. 127, 134-35 (2009)). "[I]n determining whether a suspect unambiguously invoked his right to silence, we consider the substance of the statement as well as the context in which it was made." *Thomas*, 72 Va. App. at 574.

As the majority recognizes, a suspect may invoke his right to remain silent "at any point prior to or during questioning," so long as he does so "unambiguously." *Supra* at 9 (quoting *Thomas*, 72 Va. App. at 574). The suspect must indicate his desire to exercise his right "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement" to invoke his right to remain silent. *Id.* (quoting *Davis v. United States*, 512 U.S. 452, 461 (1994)).

- 15 -

When reviewing whether a statement is a clear invocation of a defendant's right to remain silent, this Court may consider "the legal sufficiency of words spoken by a defendant," including "review of the tone of a defendant's voice, any voice inflections, and the defendant's demeanor . . . ." *Commonwealth v. Hilliard*, 270 Va. 42, 50 (2006). However, "[t]he appellate court is not permitted to use such factors to conduct its own fact finding and, to the extent that the appellate court does so, it commits error." *Id.* at 51. Otherwise, any review of such factors "is limited to the issue whether the defendant's words, as spoken, were legally sufficient" to invoke his right to silence. *Id.* at 50-51.

Statements that express uncertainty are consistently held not to be clear and unambiguous invocations of the right to remain silent. *See, e.g.*, *Mueller v. Commonwealth*, 244 Va. 386, 396 (1992) ("Do you think I need an attorney?"); *Akers v. Commonwealth*, 216 Va. 40, 45-46 (1975) ("Do I have to talk now?"); *Midkiff v. Commonwealth*, 250 Va. 262, 267-68 (1995) ("I don't got to answer that" and "I'm scared to say anything without talking to a lawyer."); *Burket v. Commonwealth*, 248 Va. 596, 609-10 (1994) ("I don't think that I should say anything."). Here, however, Stout's statement exhibited no such uncertainty. He did not present his statement as a question like *Akers*, nor did he use language that hedged his intention to remain silent as in *Burket*.

During Stout's interview, he "remained silent" and "responded very little to questions asked of him." Approximately 29 minutes into the interview, while Emerson continues questioning Stout, Stout responds, "I ain't got nothing to say." The trial court found that this statement was not a clear and unambiguous invocation of Stout's right to remain silent.

The majority cites *Green v. Commonwealth*, 27 Va. App. 646, 654 (1998), to support its position that "I ain't got shit to say to y'all" is an ambiguous invocation. *Supra* at 10. There, Green was interrogated about several crimes and invoked his right to remain silent. *Green*, 27

- 16 -

Va. App. at 654.  However, he later waived that right when he "insisted that he wanted to talk." *Id.* at 652.  Later, when asked about a different criminal act in the area, Green told the detective that "he didn't have anything more to say than what he had told me prior" and that if the detective "didn't recall" what Green told him, then he could "go back and review the tape" from his previous interview.  *Id.* at 649-50.  Green said that the detective "might as well buckle up for the long ride," turned his chair away from the detective, and closed his eyes for the following two and a half hours.  *Id.* at 650.  The court found that these statements did not constitute a clear invocation of Green's right to remain silent.  *Id.* at 652.

When reviewing the statements in *Green* as a whole, this case is distinguishable.  Green had previously made statements to the police about a related murder and attempted murder, and waived his right to remain silent when he "insisted that he wanted to talk."  *Id.* at 649.  During the subsequent interview, Green told the detective that he "didn't have anything more to say" than what he had told the detective earlier.  *Id.*  Here, Stout told officers that he "ain't got nothing to say."  In contrast to *Green*, Stout made no prior statements concerning the crime prior to his invocation.  Furthermore, Stout's invocation did not include any language of uncertainty or hedging that could lead to interpreting his right to remain silent as unclear or ambiguous.  Stout told the officer in plain language, "I ain't got nothing to say," and continued to refuse to speak with the officer, as he had mostly been doing up to that point.  The phrase "I ain't got nothing to say" is unambiguous and clearly conveys Stout's intention to refuse to answer more questions.  This is similar to the Supreme Court's ruling in *Akers*, which established that the phrase "I do not want to answer any more questions" has the same effect.  *See Akers*, 216 Va. at 46 ("If defendant had desired to end the interrogation, he could have simply said, 'I don't want to answer any more questions.'"); *see also Davis*, 512 U.S. at 459 (noting that a defendant is not required to "speak with the discrimination of an Oxford don" to assert his right to request an attorney).

- 17 -

The majority's reliance on *Mitchell* is similarly misplaced. *Mitchell v. Commonwealth*, 30 Va. App. 520 (1999); *supra* at 10. In *Mitchell*, after stating "I ain't got shit to say to y'all," the suspect "proceeded to volunteer information" to the police. 30 Va. App. at 527. "*Under these circumstances*," the court found that Mitchell's statement that he "'ain't got shit to say to y'all,' did not constitute a clear and unambiguous invocation of his Fifth Amendment right to remain silent." *Id.* (emphasis added).

Based on Stout's statement and his lack of reinitiation with the officer, I would find that Stout's assertion, "I ain't got nothing to say," is a clear and unambiguous invocation of his right to remain silent. *See Commonwealth v. Paxton*, __ Va. ___, ___ (May 29, 2025) (assuming without deciding that the Court of Appeals was correct in determining that Paxton's motion to suppress should have been granted when Paxton said "I don't wanna talk no more"); *Adkins v. Commonwealth*, No. 180485, 2019 Va. Unpub. LEXIS 8, at *6 (Mar. 28, 2019) (order) (finding that the statement "I don't have no more to say to you" is a clear invocation of his right to remain silent and terminate questioning).[7] Nevertheless, given the remaining evidence against Stout, the trial court error in denying Stout's motion to suppress his statements was harmless.

This Court "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." *Shifflett v. Commonwealth*, 289 Va. 10, 12 (2015). When "the error is constitutional in nature, 'the harmless-error standard . . . ask[s] "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction[.]"'" *Paxton*, ___ Va. at ___ (alterations in original) (quoting *Commonwealth v. White*, 293 Va. 411, 420-21 (2017)). "Under this standard, we do not 'presume that an error cannot be harmless if the factfinder considered erroneously admitted evidence.' Rather, we must determine whether it is

---

[7] Unpublished opinions, "while having no precedential value, are nevertheless persuasive authority." *Otey v. Commonwealth*, 71 Va. App. 792, 799 n.3 (2020) (quoting *Samartino v. Fairfax Cnty. Fire and Rescue*, 64 Va. App. 499, 508 n.2 (2015)).

'clear beyond a reasonable doubt that a rational [factfinder] would have found the defendant guilty absent the error.'" *Id.* at ___ (alteration in original) (quoting *White*, 293 Va. at 421-22). To make this determination, this Court must consider "the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case." *Id.* at ___ (quoting *Lilly v. Commonwealth*, 258 Va. 548, 551 (1999)).

Based on the remaining evidence against Stout at trial, it is clear beyond a reasonable doubt that a rational jury would have found Stout guilty absent the inadmissible interview statements. When Matthew heard Gregory yelling for help and exited his room, he testified that he saw Stout "standing over top" of Gregory. Although Matthew is almost "legally blind," he had known Stout for a long time, as Matthew's mother was previously married to Stout's brother, and Matthew believed that there was no confusion in his mind that it was Stout in their trailer. Matthew also ran at Stout when he saw what was happening and tried to push Stout into the bathroom to hold him there while Gregory "plead[ed] for his life" and held his neck.

When Gregory called 911, he told the operator that his "son" had cut him with a knife. Matthew testified that Stout was the only person in the trailer that Gregory referred to as "son" and that Gregory called the rest of the individuals in the trailer by their names. The only other person Gregory would sometimes call "son" was Eric McGann, Stout's half-brother, who was not present then.

Officer Michael Rossi also testified to Stout's behavior in the incident's aftermath. Rossi found Stout in the hallway between the bedrooms and bathroom, and Stout "was rather detached and stoic compared to Matthew[]." When Rossi addressed Stout, he refused to comply and instead began to walk to "the back door of the residence." Stout only complied once Rossi

yelled and pointed his gun.  Finally, Stout was found covered with blood on his pants, shoes, shirt, and hands.

Moreover, the statements made by Stout in his interrogation following his invocation to remain silent, "I ain't got nothing to say," are not of strong import to the prosecution's case. Stout told Emerson "I don't know what is happening in my head," and later said that Stout was "called to do it."  Emerson asked Stout if he grabbed Gregory by the head and cut him from behind, to which Stout replied, "pretty much."  Considering the remaining evidence, reviewed cumulatively, it is clear beyond a reasonable doubt that a rational jury would have found Stout guilty, and the error in the trial court's admission of Stout's interview is harmless.  *See, e.g.*, *White*, 293 Va. at 422-24 (finding that any error in denying White's motion to suppress evidence was harmless as a matter of law because the remaining evidence, including evidence found on and around White's person, demonstrated beyond a reasonable doubt that a rational juror would have found him guilty without the disputed evidence and the disputed evidence played a limited role at trial); *McLean v. Commonwealth*, 32 Va. App. 200, 216-17 (2000) (same); *Bass v. Commonwealth*, 31 Va. App. 373, 391-92 (2000) (same).

I respectfully dissent from the majority's opinion that Stout did not clearly invoke his right to remain silent.  However, the evidence, taken together without the interview statements, is clear beyond a reasonable doubt for a jury to convict Stout of second-degree murder.  As such, the error in admitting the statements from Stout's interview after invoking his right to remain silent was harmless.  Therefore, I concur with the majority's decision to affirm the trial court's judgment.